804 N.E.2d 1108 (2004)
346 Ill. App.3d 443
281 Ill.Dec. 813
In re K.H., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Tabitha H., Respondent-Appellant).
No. 2-03-0274.
Appellate Court of Illinois, Second District.
February 20, 2004.
*1110 Michael J. Conway (Court-appointed), Waukegan, for Tabitha H.
Michael J. Waller, Lake County State's Attorney, Waukegan, Martin P. Moltz, Deputy Director, State's Attorneys Appellate Prosecutor, Elgin, Paul Benjamin Linton, Northbrook, for the People.
Presiding Justice O'MALLEY delivered the opinion of the court:
Respondent, Tabitha H., appeals the orders of the circuit court of Lake County, finding her an unfit parent pursuant to sections 1(D)(g), 1(D)(m)(i), and 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(g), (D)(m)(i), (D)(m)(iii) (West 2002)), and terminating her parental rights with respect to her daughter, K.H. Respondent contends that the trial court's orders were against the manifest weight of the evidence. We affirm.
On April 2, 2002, the State filed a petition to terminate respondent's parental rights, alleging that she was unfit to parent her child. Specifically, the State alleged that respondent failed to protect K.H. from injurious conditions, failed to make reasonable efforts to correct the conditions that were the basis for the original removal of K.H., and failed to make reasonable progress toward the return of K.H., within both the initial nine-month period following the adjudication of neglect and any nine-month period thereafter. A bench trial ensued.
Department of Children and Family Services (DCFS) reports that were admitted into evidence at trial explained the history of K.H.'s case. K.H. was born on December 15, 1997. The first incident involving domestic violence occurred in January 1999 when respondent's paramour, Edward Golden, bit K.H. on the cheek, causing a bruise. Respondent was "indicated" as a result of this incident. On April 11, 1999, K.H. sustained a fractured leg, again at the hands of Golden. K.H. received no medical treatment for this injury until six days later when respondent finally took her to a hospital. At the hospital, respondent offered conflicting explanations for K.H.'s injury but finally admitted that it was inflicted by Golden. Respondent was asked to have Golden leave her home. Respondent refused and made a care plan for K.H. to reside with respondent's sister. Golden was arrested for domestic battery for a separate incident where respondent was the victim. On June 14, 1999, a court ordered that Golden have no contact with either respondent or K.H. Following Golden's incarceration, K.H. was returned to respondent. K.H. was adjudicated neglected on October 7, 1999. After his release from jail, Golden was found living with respondent and K.H. On December 10, 1999, the court granted the State's emergency motion to change placement. The court placed K.H. with her maternal grandparents. On October 19, 2000, respondent gave birth to a son, of whom Golden was the father.
Cynthia Peterson, a caseworker with Central Baptist Family Services, testified at trial. She stated that she became involved with respondent's case in July 2000. In July 2000, Peterson met with respondent to discuss the objectives and tasks of respondent's service plan. Respondent was given an overall satisfactory evaluation for each objective and most of her assigned tasks. On December 19, 2000, K.H. was returned to respondent.
Three weeks later, on January 9, 2001, when Peterson arrived at respondent's home to take K.H. to daycare, she observed *1111 a "very large hand print" on the child's face. Peterson described the mark as "a perfect hand print on her cheek." Peterson asked respondent what had happened. Respondent replied that she had returned home from work late the night before and had not noticed the mark on K.H.'s face until the next morning when she got up. Respondent stated that she asked Golden, with whom she was once again cohabitating, what had happened and he replied that he had been "slap boxing" with K.H. while respondent was at work. Peterson testified that respondent defended Golden and "tried to rationalize that they had been playing." Respondent and her children were placed in a shelter until Golden was arrested and incarcerated. After that, they were allowed to return home.
On February 2, 2001, respondent's progress on her service plan was again evaluated. The goal was for K.H. to remain at home with respondent. On respondent's objective of improving her parenting skills, she was given an overall evaluation of satisfactory. On respondent's objectives of addressing domestic violence, cooperating with services, and securing stable housing, she was given overall evaluations of unsatisfactory. Respondent had discontinued her domestic violence counseling, was unable to pay her rent and utilities, was not working, and had allowed unapproved persons to watch her children.
On July 5, 2001, respondent and her children were evicted from their home for failing to pay rent. Respondent arranged for K.H. to live with respondent's parents and for her son to live with Golden's parents. On August 15, 2001, Peterson again evaluated respondent, establishing a single objective for respondent of providing for the safety of her children via a number of assigned tasks. Peterson also evaluated respondent on the objectives of the earlier plan. Respondent was given an overall evaluation of unsatisfactory because she had been evicted from her apartment and did not have a place to live. Peterson also pointed out that the service plan for that period mandated that respondent continue to cooperate with the service plan that was created on December 14, 2000. One of respondent's tasks outlined in that service plan was to "actively participate" in domestic violence counseling. Peterson testified that respondent discontinued domestic violence counseling in January 2001 and had not resumed it by August 2001.
Peterson testified on cross-examination that respondent regularly visited K.H. while K.H. was living with her grandmother. Also, respondent maintained regular contact with Peterson while Peterson was assigned to respondent's case. Peterson testified that respondent had cooperated fully in the investigation and resolution of the January 8 domestic violence incident. Peterson testified that she was taken off respondent's case because her one-year assignment to the case had expired.
Marcia Staggs testified that, like Peterson, she was a caseworker for Central Baptist Family Services. On October 22, 2001, respondent's case was transferred to Staggs. Staggs' testimony, along with documentary evidence that was introduced at trial, described proceedings that took place on September 26, 2001, one month prior to Staggs' assignment to the case. Following a hearing conducted on September 26, 2001, the court removed K.H. from the custody of respondent and placed her with her maternal grandparents. Prior to that date, K.H. had resided with her maternal grandparents under a voluntary arrangement with respondent. A permanency order entered on the same date as the custody order provided that respondent was not allowed to remove K.H. from the custody of the grandparents. The same *1112 permanency order changed K.H.'s permanency goal from return home to private or subsidized guardianship. A transcript of the permanency hearing is not included in the record on appeal, but Staggs testified that her understanding of the reason for these changes was that Golden was about to be released from prison and respondent had made a statement that she intended to return to him.
Staggs also testified about respondent's progress in overcoming her problems with domestic violence. Staggs stated that, at the time that she took over the case on October 22, 2001, respondent had not participated in any domestic violence counseling since January 2001. Staggs prepared a new service plan and, in November, met with respondent. On December 10, 2001, Staggs evaluated respondent's performance. Respondent was given an unsatisfactory evaluation on each of the four objectives that she was assigned. Respondent was rated unsatisfactory on addressing domestic violence issues because, at the time of the evaluation, respondent still had not participated in any domestic violence counseling. Respondent also was rated unsatisfactory on parenting because she had not attended parenting classes as she had been directed. Further, respondent was rated unsatisfactory on the objective of attending mental health counseling because she had attended no mental health counseling. Respondent's progress also was rated unsatisfactory on the tasks of maintaining a job for at least six months, obtaining housing after paying a $3,000 debt, visiting K.H. weekly, developing a budget, and choosing her children over her paramours. Finally, respondent did not attend staff meetings, administrative case reviews, or court hearings. Staggs testified that, overall, respondent was very uninvolved with the case. As an example, Staggs cited the fact that respondent had called her only once during the 90 day review period, and that was to discuss her other child. Staggs also pointed out that no service plan tasks had been completed during the 90 day period.
For a period of approximately six weeks, from late December 2001 to early February 2002, respondent resided at A Safe Place, a domestic violence shelter. While respondent lived at the shelter, she received services related to various topics, including domestic violence, and she consistently visited K.H. The services that respondent received were mandatory if she was to reside at the shelter. Against Staggs' advice, respondent left the shelter three days before she was scheduled to be discharged, in order to move in with a 45year-old paramour. Staggs recommended that respondent, instead, move in with a female friend, move to a halfway house, or find some other arrangement that did not involve a paramour. Staggs testified that she believed that the biggest issue in the case was respondent's tendency to gravitate toward abusive men and that this tendency prevented respondent from gaining independence and learning to take care of both herself and her children.
On March 7, 2002, another evaluation, covering the period since October 27, 2001, was conducted. Respondent received an unsatisfactory evaluation on three of the objectivesmaintaining a domestic-violence-free lifestyle, demonstrating appropriate parenting skills, and addressing her mental health issues. Respondent received a satisfactory evaluation for her cooperation with services. Staggs was asked why respondent was rated unsatisfactory on complying with her domestic violence tasks when she had received services for six weeks while residing at A Safe Place. Staggs made clear that the reason for the unsatisfactory evaluation was that, although respondent was cooperative and *1113 received "some services" while at A Safe Place, she participated in no services for the remainder of the evaluation period.
During the period covered by the March 7, 2002, evaluation, K.H. was moved to a non-relative foster home from her maternal grandparent's house, because the grandmother was no longer able to care for K.H. On January 25, 2002, K.H. was placed in the foster home where she has resided since.
Respondent was evaluated again on September 4, 2002. (Respondent objected to this evidence and the trial court ruled that it would consider the evidence to the extent that it related to the time before the State filed its petition for termination of respondent's parental rights on April 2, 2002.) Once again, respondent received an unsatisfactory evaluation on all of her assigned objectives. Respondent had not regularly attended domestic violence counseling, parenting classes, or mental health counseling. During this period, respondent did have a good record of visiting with K.H., but, on one occasion, respondent brought a paramour with her and introduced him to K.H. as "her new daddy."
Respondent testified that she was 25 years of age and had resided in an apartment in Waukegan since February 2002. She had obtained a job as a care manager at Sunrise Assisted Living in Gurnee. Respondent testified that, at the time of the trial, she had been working at Sunrise Assisted Living for about three months and believed that it would be a long-term job because she enjoyed the work, was able to work a sufficient number of hours, and was comfortable there. While respondent held a number of jobs during the pendency of this case, most were for short periods of time. Her longest period of employment was from 1998 to January 2001 at a nursing home in Zion.
Respondent testified that K.H. lived with her for about 2½ to 3 years of the child's life and that the only times they have not resided together were when the trial court originally removed the minor and since July 2001, when K.H. was voluntarily placed with respondent's parents. Respondent testified that she and K.H. had developed a bond. When respondent visited K.H. during the period that K.H. was not living with respondent, they they played together at the park, played games, colored, read stories, and engaged in other activities. Respondent explained that she missed visitation only when she had transportation difficulties or when she and her mother were having disagreements, so as to spare K.H. from observing those conflicts.
Respondent testified that she attended various domestic violence and parenting groups. She attended various programs at A Safe Place from December 1999 until February 2002. Respondent also testified that she had three caseworkers and always had regular and consistent contact with the first two, Wells and Peterson. Respondent initially thought that she needed to contact Staggs only every other week, but recently contacted Staggs every week.
Respondent also explained the January 8, 2001, incident where Golden slapped K.H. Respondent testified that she noticed a mark on K.H.'s face when she returned home from work that night and questioned Golden about it. Respondent also testified that, when Peterson arrived the next morning, she told Peterson about the incident and was very open. Respondent believed that she cooperated with Peterson. She also stated that she chose K.H. over Golden by going to a shelter. Respondent testified that she wanted K.H. returned to her. She stated that, because of her current job, she felt better able to support herself and K.H.
*1114 Respondent noted that she became delinquent on her rent and was evicted in July 2001. At that time, she voluntarily placed K.H. with K.H.'s maternal grandparents. Respondent had been working at the nursing home in Zion until January 2001 but took a leave of absence because she did not have a babysitter for her children. Until January 2001, respondent paid her rent on time. Respondent also testified that she has not allowed Golden to have any contact with K.H. since early 2001.
On cross-examination, respondent testified that K.H. was adjudicated neglected because Golden injured her in 1999. Respondent admitted that, when the injury occurred, she attempted to cover for Golden because she did not want to get him into trouble. Respondent acknowledged that, at the time of trial, she had not yet successfully completed domestic violence counseling or obtained a new psychological evaluation. She also admitted that she had stopped attending parenting groups. Respondent testified that she had not obtained an order of protection against Golden and had visited him in jail on more than one occasion.
Ann Wells, who was called by respondent, was respondent's caseworker prior to Peterson and Staggs. Wells testified that she was a child welfare specialist employed with DCFS. In 2000, she was assigned to respondent's case and prepared a service plan on which she evaluated respondent in May 2000. Wells assigned respondent six objectives, which were to maintain a suitable home, obtain a psychological evaluation, cooperate with DCFS, address her domestic violence issues, complete a parenting class, and maintain visitation with K.H. Wells evaluated respondent as satisfactory on all but the parenting class objective, as the class schedule conflicted with respondent's work schedule and she was unable to attend regularly. Wells testified that she believed that respondent did a good job of parenting K.H. and was absorbing and using the information she got from the parenting classes that she did attend.
On cross-examination, Wells testified about respondent's ongoing issues with domestic violence. She testified that, in March 2000, Golden struck respondent in the face, causing an injury to respondent's lip. To Wells' knowledge, respondent did not contact the police regarding this incident. Wells related that she had numerous conversations with respondent about domestic violence and believed that, respondent did not contact the police out of fear and a desire to protect Golden. During the period that Wells was assigned to the case, she observed respondent become less consistent in obtaining domestic violence counseling.
Following argument, the trial court found that respondent was an unfit parent. The trial court specifically noted that respondent "cares about her child," "has a relationship with her child," and "loves her child." The court also noted that visitations went well and that K.H. loved to see respondent and enjoyed the visits. The court determined, however, that respondent had not adequately addressed the issue of domestic violence.
The court noted that, in 1999, K.H. had been adjudicated neglected because respondent had not taken her for medical treatment for her fractured leg for several days. The court observed that respondent repeatedly put the interests of her paramours before the interests of her daughter and exhibited "an overall lack of progress" and "an overall inability to care for the minor and ensure her safety." The court held that the State met its burden of proving by clear and convincing evidence that respondent was unable to protect K.H. *1115 from conditions in her environment that were injurious to her welfare, had not made reasonable efforts to correct the conditions that were the basis for the removal of the child, and had not made reasonable progress toward the return of the child in any nine-month period after the end of the initial nine-month period following the adjudication of neglect.
The case proceeded to the best interests hearing. Staggs was the only witness who testified at this stage of the proceedings.
Staggs testified that respondent had a dependent personality disorder and placed others first in her life, which put K.H. in jeopardy. Staggs observed that, at the last visitation between respondent and K.H. for which Staggs was present, respondent brought a paramour with her.
Staggs testified that, since January 25, 2002, when K.H. was placed in her current foster home, she has spoken increasingly less of her mother. K.H. refers to the foster home as her home and calls the foster parents "Mommy" and "Daddy." The foster parents are ready, willing, and able to adopt K.H. The foster parents speak positively about respondent, and have facilitated contact between K.H. and her biological relatives. K.H. has expressed a desire to stay with the foster parents and take their last name as her own. K.H. has told respondent how much the foster parents love her. The foster parents love K.H. unconditionally and are thrilled to have her in their home.
Staggs related an incident where, after completing a home visit at the foster home, she transported K.H. to day care. Staggs did not take the normal route that the foster parents took to the day care center, and K.H. became very upset and began to cry. Staggs explained that she realized that K.H. must have thought that she was being taken to a new placement and would not see her foster parents again. Only when Staggs drove into familiar surroundings was she able to reassure K.H. that she was being taken to day care.
Staggs testified that stability and permanency were the most important factors in K.H.'s life. If respondent's parental rights were not terminated, then K.H. would have no permanency, would remain insecure, and would experience other negative emotional and psychological effects. The court granted respondent's request to consider her testimony from the fitness hearing regarding her visitation and bonding with K.H.
The trial court ruled that it was in K.H.'s best interests to terminate respondent's parental rights. The court acknowledged that there was a bond between respondent and K.H., but observed that it would not be in K.H.'s best interests to keep K.H. in legal limbo while respondent continued to attempt to work toward K.H.'s return. The court also noted that, in her last visit with K.H., respondent had brought along "another paramour," and it commented on the inappropriateness of that action. The court concluded that this behavior did not show that respondent did not love her daughter, but it illustrated that respondent was unable to care for her at that time and at any time in the near future. The court noted that K.H. was flourishing in her current foster placement, which was very good for her, especially her emotional well-being. The court terminated respondent's parental rights and denied respondent's motion to reconsider. Respondent timely appeals. On appeal, respondent contends that both the trial court's unfitness finding and its determination of K.H.'s best interests were against the manifest weight of the evidence.
Respondent first argues that the trial court's unfitness finding was against *1116 the manifest weight of the evidence. Because termination of parental rights permanently and completely severs the parent-child relationship, a finding of parental unfitness must be based on clear and convincing evidence. In re C.N.), 196 Ill.2d 181, 208, 256 Ill.Dec. 788, 752 N.E.2d 1030 (2001). That said, we will reverse the trial court's determination of unfitness only if it was against the manifest weight of the evidence. C.N., 196 Ill.2d at 208, 256 Ill. Dec. 788, 752 N.E.2d 1030. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. C.N., 196 Ill.2d at 208, 256 Ill.Dec. 788, 752 N.E.2d 1030.
One of the specific bases on which the trial court found respondent unfit was that she failed to make reasonable progress toward the goal of returning K.H. home in a nine-month period after, the initial ninemonth period that followed the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2002)). Respondent argues that this holding is against the manifest weight of the evidence. Our supreme court has held that "the benchmark for measuring a parent's `progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's, compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." C.N., 196 Ill.2d at 216-17, 256 Ill.Dec. 788, 752 N.E.2d;, 1030. Based on this rule, our view is that, in the instant case, the most relevant measure of respondent's progress toward the goal of returning K.H. to respondent is respondent's advancement on issues related to domestic violence, because K.H.'s exposure to domestic violence was the primary reason that she was adjudicated neglected and the primary concern of her caseworkers who testified at trial. We hold that the trial court's ruling was not against the manifest weight of the evidence. In particular, we find that there was sufficient basis in the record for the trial court to conclude that respondent failed to make reasonable progress in addressing her tendency to expose her daughter to domestic violence.
In attempting to show that she made reasonable progress, respondent points to the satisfactory evaluations of her progress made by her caseworkers between the adjudication of neglect on October 7, 1999, and February 2001. Respondent attributes the poor evaluations she received thereafter to the fact that Staggs, her new caseworker, decided that returning K.H. to respondent's custody was no longer an appropriate goal. Respondent also emphasizes that she continues to address her issues through counseling at A Safe Place and is working to get her daughter back. Respondent argues that she now has stable employment and is able to support herself and K.H.
It is true that respondent initially made some advances. In fact, based on this progress, K.H. was returned to respondent in December 2000. However, three weeks later a new incident of domestic violence occurred in which K.H. was slapped in the face, sustaining a handprint-shaped bruise. As the case progressed, respondent's progress slowed. Specifically, respondent failed to complete her tasks related to domestic violence and failed to place her children's needs ahead of those of her paramours.
Each of respondent's three case workers testified about respondent's difficulties in addressing her problems with domestic violence. First, although Wells believed that respondent made satisfactory progress in addressing domestic violence during *1117 her oversight of the case, she also testified that, as time went on, respondent became less consistent in obtaining domestic violence counseling. Further, during this period, respondent sustained an injury to her lip when she was struck in the face by Golden. To Wells' recollection, respondent failed to immediately report this incident to police. Wells testified that domestic violence was a "continual ongoing issue" for respondent.
Next, Peterson testified that respondent did not consistently attend domestic violence counseling while she was assigned to the case. Significantly, Peterson testified that respondent discontinued domestic violence counseling in January 2001. Respondent did not resume counseling for the remainder of the period that Peterson was assigned to the case. Further, although Peterson observed some satisfactory progress by respondent, she noted that respondent was not able to maintain steady employment and living conditions. In her February 2, 2001, and August 15, 2001, evaluations, Peterson found respondent's progress on her service plan unsatisfactory overall.
Staggs testified that this trend continued. Respondent did not attend domestic violence counseling except for the six-week period that she resided at A Safe Place. Respondent also stopped cooperating with service providers and continued to place her paramours first, as demonstrated by moving in with an older paramour against the explicit advice of her caseworker. Further, respondent brought her paramour along to visitation with K.H., introducing him to K.H. as her "new daddy."
Although the three days at the domestic violence shelter that respondent decided to forgo may not be, in themselves, particularly important, the reason that respondent decided to forgo them, to move in with a new paramour, is important given the nature of this case. Respondent skipped her last three days at A Safe Place to move in with a new paramour, 20 years her senior, against the explicit advice of her caseworker. This is significant for two reasons. First, it represents a fresh incident where respondent put the interests of a paramour ahead of those of K.H. Specifically, rather than complete her program at A Safe Place and follow the advice of her caseworker not to move in with a paramour, two decisions that would have been beneficial to K.H., respondent chose to leave A Safe Place early to move in with a paramour. Second, according to Staggs, respondent's moving in with a paramour represented negative progress in treating her dependent personality disorder because respondent needed to learn to live independently in order to overcome the disorder. Staggs explained why it was important that respondent not immediately move in with a paramour:
"[The State]: With [respondent] leaving so close to completing the program, what was your recommendation to her as far as living arrangements after leaving A Safe Place?
[Staggs]: Certainly we looked at a female friend, any kind of halfway house oryou know, anything but a paramour. That certainly was theIt appeared to be the biggest issue in this case, hooking up with paramours that were abusive. So the concern was for her to become independent. The psychological addressed also the dependent personality. Learning how to become independent and take care of herself and take care of her children." (Emphasis added.)
Thus, according to Staggs, respondent's moving in with a paramour represented negative progress in treating the psychological issues that led respondent to repeatedly expose K.H. to physical abuse.
*1118 A consistent aspect of all three caseworkers' testimony was that respondent was unable to sufficiently address and remedy the issues of domestic violence in her life. The "`"failure to make reasonable progress toward the return of the child to the parent" includes * * * the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care * * *.'" C.N., 196 Ill.2d at 217, 256 Ill.Dec. 788, 752 N.E.2d 1030, quoting 750 ILCS 50/1(D)(m) (West Supp. 1999). Respondent sporadically attended various counseling designed to assist her in identifying and overcoming her issues related to domestic violence; however, the caseworkers all identified domestic violence as a continuing issue that respondent failed to consistently address or make progress in overcoming. The record demonstrates, and respondent herself admitted, that she did not complete her tasks related to domestic violence, even at the time of the termination hearings.
The sole question we must answer is whether the trial court's finding that respondent failed to make "reasonable progress" during a nine-month period (750 ILCS 50/1(D)(m)(iii) (West 2002)) was against the manifest weight of the evidence. The legislature has provided that a parent who does not make reasonable progress toward the return of her child during any nine-month period after the initial nine-month period following the adjudication of neglect is unfit. 750 ILCS 50/1(D)(m)(iii) (West 2002). As harsh as this may seem, this rule is not without purpose. This provision acts to abate the harm that a perpetual lack of permanency inflicts on children, because it mandates that parents must, with some degree of consistency, make reasonable progress toward their children's return home or risk forfeiting their parental rights. By so doing, the provision balances the potential positive effect of time on a parent's ability to care for his or her child with the negative effect of time on the child's psyche. Simply put, a parent is required to make reasonable progress during a nine-month period. For this reason, respondent's early success is not determinative. The trial court had an adequate basis to find that the State proved by clear and convincing evidence that respondent failed to make reasonable progress in a nine-month period after the nine-month period that followed the adjudication of neglect. We hold that the trial court's determination that respondent was an unfit parent under section 1(D)(m)(iii) was not against the manifest weight of the evidence.
Because parental rights may be terminated based on a single ground of unfitness (In re D.D., 196 Ill.2d 405, 422, 256 Ill.Dec. 870, 752 N.E.2d 1112 (2001)), we need not consider the additional grounds of unfitness determined by the trial court.
The dissent begins its argument by generally indicting the juvenile court system as "plagued." It is apparent that the dissent's issues with the "system" are based on information outside of the record on appeal. Because our function is to decide this case based on the record, we limit our analysis to the issues arising therefrom.
The dissent's other arguments are flawed because the dissent fails to follow the well-settled manifest weight standard of review (see, e.g., C.N., 196 Ill.2d at 208, 256 Ill.Dec. 788, 752 N.E.2d 1030), and instead reweighs the evidence, substituting its own judgment for that of the trial court. In order for a court of appeals to reverse a trial court's finding of unfitness, the opposite conclusion must be "clearly evident." C.N., 196 Ill.2d at 208, 256 Ill. Dec. 788, 752 N.E.2d 1030. Moreover, our supreme court has explained that a trial court's findings on unfitness should be given *1119 "great deference" because the trial court has the opportunity to observe the demeanor of the witnesses as they testify. In re Brown, 86 Ill.2d 147, 152, 56 Ill.Dec. 4, 427 N.E.2d 84 (1981). The dissent's failure to give proper deference to the trial court pervades its analysis. For example, the dissent bases its conclusions in large part on its assessment that one of the State's witnesses, Staggs, was not credible. However, only the trial court heard Staggs testify and observed her demeanor. For this reason, the trial court was in a superior position to judge her credibility. Similarly, the dissent relies on respondent's self-serving testimony that her counselor told her that she could discontinue counseling. The dissent defends this by stating that "the trial court made no findings at the close of the hearing that indicated that it did not find the respondent's testimony credible on this issue." Op. 281 Ill.Dec. at 833-834, 804 N.E.2d at 1128-1129. However, the dissent does not cite, nor are we aware of, any authority for the proposition that the manifest weight standard of review applies only to explicit findings of fact. We note that respondent does not dispute that her caseworkers, who testified at trial, made clear to her that counseling was required. The plenary character of the dissent's review undermines its conclusion that the trial court's decision was against the manifest weight of the evidence.
We note also that the testimony in this case contains vague references that the judge and the parties, having been privy to previous hearings in this case, seem to adequately comprehend. Having presided over a custody hearing and two permanency hearings that are part of this case but not part; of the record on appeal, the trial judge was in a particularly good position to understand the significance and context of the evidence presented. From the previous two sentences, the dissent concludes that we place "great weight" on the custody hearing and permanency hearings and "speculate as to what transpired at those hearings." Op. 281 Ill.Dec. at 841, 804 N.E.2d at 1136. Our point is much narrower than this. We do not suggest that the trial court may rely on evidence presented at a previous hearing in finding a parent unfit. Rather, we observe that the trial court's familiarity with the case may aid it in understanding the evidence presented at the termination hearing. Our point is simply that the rule that we are to give "great deference" to the trial court's findings is quite apt in this case.
Next, the dissent repeatedly emphasizes the supposed high speed in which the State filed its petition to terminate parental rights and even goes so far as to assert that the State filed its petition "for the most minimal of reasons." Op. 281 Ill.Dec. at 830, 804 N.E.2d at 1125. In so doing, the dissent treats the January 8, 2001, incident, where Golden slapped K.H. in the face, as if it were the first and only incident of domestic violence. In reality, K.H. was adjudicated neglected on October 7, 1999, more than 3½ years before the State filed its petition to terminate respondent's parental rights. There were three reported incidents where Golden battered K.H., and a fourth where he battered respondent. At the hands of Golden, K.H. received a fractured leg, a bite on the face, and a blow to the face that left a clear handprint-shaped bruise. Golden also "busted" respondent's lip. The earliest of these incidents occurred in January 1999, more than four years before the State filed the petition to terminate parental rights. Thus, the State did not act "in the most rapid of fashions" (op. 281 Ill.Dec. at 830, 804 N.E.2d at 1125) but, rather, gave respondent a period of well over three years to successfully address her problems. Furthermore, we disagree with the dissent's characterization of the repeated *1120 physical abuse of K.H. as "the most minimal of reasons."
The dissent argues that respondent's stay in a domestic violence shelter demonstrates reasonable progress. We do not dispute that the 42 days that respondent spent at A Safe Place represents some progress on her part. It is clear that respondent received mandatory services, including domestic violence counseling, while at the shelter, although we note that the dissent's repeated descriptions of A Safe Place as "intensive domestic violence counseling" (op. 281 Ill.Dec. at 831, 804 N.E.2d at 1126) and as an "intensive domestic violence program" (op. 281 Ill.Dec. at 832, 804 N.E.2d at 1127) do not appear in the record. While we do not discount respondent's efforts while at A Safe Place, the trial court had adequate basis to hold that respondent failed to make reasonable progress within a nine-month period because of respondent's failure to make any progress either before or after her stay at the shelter. For an 11 month period, from January 2001 to late December 2001, respondent attended no domestic violence counseling. When respondent left the shelter, she again attended no domestic violence counseling.
The dissent also finds it determinative that there was no evidence of a new abusive relationship following the relationship with Golden. While we note in passing that the record does contain Staggs' September 4, 2002, report indicating that Staggs observed bruising on one of respondent's arms and heard that respondent's new paramour was abusive, our view is that the State did not need to show new instances of domestic violence because it provided sufficient evidence for the trial court to find that respondent had a serious issue with exposing her children to domestic violence that she failed to make reasonable progress in addressing.
We do not share the dissent's view that, because K.H. had been returned to respondent's custody, respondent was doing what she was supposed to be doing. Absent the three instances of physical abuse of K.H. and the one incident of physical abuse of respondent, it would be none of the State's business whether respondent successfully completed domestic violence counseling or with whom respondent chose to cohabit. However, precisely because of the ongoing domestic violence, a service plan was developed and respondent was obligated to comply with it and to make reasonable progress toward reuniting with her child. See C.N., 196 Ill.2d at 217,256 Ill.Dec. 788, 752 N.E.2d 1030. the dissent seems to think that the condition at issue was limited to respondent's relationship with one paramour, Golden. The social service experts and the trial court saw the incidents involving Golden as evidence of a broader problem with domestic violence. With respect to the caseworkers, this is evident from the fact that they repeatedly assigned respondent counseling to address what Wells termed respondent's "continuing ongoing issue" with domestic violence. Respondent's goal of extricating herself from a lifestyle of domestic violence required more than simply ending her relationship with Golden; it required that she successfully address her issues, psychological or otherwise, that led her to repeatedly allow her daughter to become a victim of domestic violence and to act, on multiple occasions, to protect her daughter's abuser from the authorities.
Next, the dissent pursues at length an argument never even raised by respondent, namely, that the trial court's decision cannot withstand appellate review because the psychological evaluation conducted of respondent was not submitted into evidence. While the exact breadth of the problem that the dissent sees with the *1121 psychological evaluation is unclear, the dissent apparently believes that without the psychological report there is insufficient evidence that respondent had problems, or at least problems of a psychological nature, that she needed to address through counseling. Thus, according to the dissent, "the State failed to demonstrate how K.H. would be harmed" if respondent failed to complete "additional mental health counseling." Op. 281 Ill.Dec. at 835, 804 N.E.2d at 1130.
We note that the dissent does not cite any authority for the premise that the State must specifically "demonstrate how [a child] would be harmed" by a respondent's failure to complete a task. In any case, our supreme court has stated that service plans "must reasonably relate to `remedying a condition or conditions that gave rise or which could give rise to any finding of child abuse or neglect.'" (Emphasis omitted.) C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030, quoting 325 ILCS 5/8.2 (West 1998). Thus, in this case, the service plans needed to reasonably relate to remedying the conditions that caused K.H. to repeatedly be exposed to domestic violence.
One of the conditions that gave rise to the removal was respondent's conduct in repeatedly exposing K.H. to Golden's abuse. While we are not experts on the matter, mental health counseling and domestic violence counseling seem to us "reasonably related" (see 325 ILCS 5/8.2 (West 2002); C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030) to remedying this condition. More significantly, respondent's caseworkers are experts on the matter, and they all assigned respondent counseling in one form or another. Furthermore, we note that the State presented evidence that, on multiple occasions, respondent attempted to protect Golden from the authorities and rationalized Golden's conduct with respect to K.H. We think that the trial court could have found that mental health counseling was reasonably related to remedying whatever condition caused respondent to engage in this conduct. Finally, both Peterson and Staggs testified about the psychological evaluation that was conducted of respondent. Staggs testified that the evaluation both diagnosed respondent with a dependent personality disorder and noted that she needed to learn to live independently. Likewise, Peterson testified that the evaluation recommended that respondent undergo therapy for self-esteem and domestic violence issues.
The dissent does not consider Staggs' and Peterson's testimony regarding respondent's psychological condition because it is hearsay. It is true that Staggs' and Peterson's testimony regarding the content of the report is hearsay evidence. However, none of the parties objected to this testimony or, for that matter, at any time questioned the accuracy of Staggs' testimony that the report said that respondent had a dependent personality disorder or Peterson's testimony that the report recommended therapy for self-esteem and domestic violence issues. The most obvious reason for respondent's failure to object to the caseworkers' testimony is that their testimony was consistent with the psychological report. Thus, an objection would have been pointless.
The dissent responds to this point by attempting to announce a new rule that it is "unacceptable for attorneys representing a child and a natural parent" to allow the State to present hearsay evidence at termination proceedings. Op. 281 Ill.Dec. at 836, 804 N.E.2d at 1131. The breadth of this rule, for which the dissent cites no authority whatsoever, is apparently wide. The dissent asserts that "all procedural safeguards must be adhered to," a statement *1122 that sounds benign until the dissent makes clear that it considers objecting to hearsay evidence to be a "procedural safeguard." Op. 281 Ill.Dec. at 836, 804 N.E.2d at 1131. Are all potentially meritorious objections "procedural safeguards?" Also, the stated reason for the rule is "the magnitude of the issues involved." Op. 281 Ill.Dec. at 886, 804 N.E.2d at 1131. We wonder what other types of weighty cases the dissent would apply this rule to or, for that matter, what types of cases are not important enough that "all procedural safeguards must be adhered to." Our supreme court has said that "[i]t is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." Jackson v. Board of Review of the Department of Labor, 105 Ill.2d 501, 508, 86 Ill.Dec. 500, 475 N.E.2d 879 (1985). Additionally, "Illinois courts have held that the rules of evidence to be applied in civil cases also apply to parental rights termination proceedings." In re J.B, 346 Ill.App.3d 77, 81, 281 Ill.Dec. 376, 803 N.E.2d 997 (2004). We observe that the dissent's new rule that appellate courts must, without so much as a request by a party, reverse a trial court's decision because of a lawyer's failure to make a hearsay objection would truly revolutionize appellate standards of review.
The dissent also claims that our statement that the obvious reason for respondent's counsel's failure to object is that it would not have helped his client is "based on nothing more than conjecture and is clearly wrong." Op. 281 Ill.Dec. at 839, 804 N.E.2d at 1134. In so claiming, the dissent ignores the "strong presumption" that an action or inaction on the part of an attorney is the product of a sound trial strategy. People v. Richardson, 189 Ill.2d 401, 411, 245 Ill.Dec. 109, 727 N.E.2d 362 (2000). The dissent also accuses us of speculating that the psychological evaluation "contained negative information about the respondent." Op. 281 Ill.Dec. at 840, at 46. This is not speculation. Both Staggs and Peterson specifically testified about the negative content of the psychological evaluation. Rather, the dissent's problems with the hearsay evidence are based on the double speculation that respondent's caseworkers lied about the psychological report and that respondent's counsel was ineffective in not objecting to the false testimony. The dissent engages in this double speculation in direct contravention of the manifest weight standard of review and the presumption that an action on the part of an attorney is the product of sound trial strategy. We think that the trial court could consider Staggs' and Peterson's hearsay testimony in determining that her psychological, counseling was reasonably related to the condition that gave rise to K.H.'s removal.
We also note that the dissent's conclusion that mental health counseling was not reasonably related to the condition that gave rise to K.H.'s removal (op. 281 Ill. Dec. at 835, 804 N.E.2d at 1130) provides yet another example of the dissent's failure to abide by the manifest weight standard of review. Not only does the dissent fail to explain why it believes that it is "clearly evident" (C.N., 196 Ill.2d at 208, 256 Ill. Dec. 788, 752 N.E.2d 1030) that the trial court was mistaken in its implicit finding that respondent's counseling met the "reasonably related" standard (C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030), it does not even mention the manifest weight standard of review in this context.
Next, the dissent describes the facts in a manner that creates the impression that respondent took more initiative than she did in reporting Golden's January 8, 2001, abuse of K.H. According to the dissent, following the January 8, 2001, incident *1123 where Golden left a handprint-shaped bruise on K.H.'s face, "[t]he respondent met with her caseworker the following day and informed her of this abuse." Op. 281 Ill.Dec. at 831, 804 N.E.2d at 1126. While it is true that respondent "met with her caseworker," the reason for the meeting was that the caseworker, Peterson, went to respondent's house the morning after the injury to take K.H. to daycare. Also, respondent "informed" Peterson that Golden inflicted the injury only after Peterson questioned her about the bruise on K.H.'s face. Peterson testified that, although respondent eventually cooperated, she defended Golden and "tried to rationalize that [Golden and K.H.] had been playing." We think that these distinctions are significant, given that the issue with respondent's fitness was related to her dependency on others and her inability to take initiative in protecting herself and her daughter from domestic violence.
Similarly, the dissent states that "[t]he record reveals that the only boyfriend of the respondent's that abused K.H. or the respondent was Eddie Golden." Op. 281 Ill.Dec. at 843, 804 N.E.2d at 1138. In truth, the record merely contains no evidence that respondent was abused by anyone but Golden.
The dissent also argues that respondent's caseworkers included tasks not related to the issue of domestic violence in respondent's service plans and evaluated respondent as unsatisfactory in her completion of these superfluous tasks. This argument ignores the fact that respondent repeatedly did not complete the tasks related to domestic violence that all can agree were not superfluous. The trial court specifically noted that its decision was based on its finding that issues of domestic violence "prevail throughout [respondent's] life" and "creep into [K.H.'s] life." There is nothing in the record that suggests that the court relied on respondent's failure to complete superfluous tasks in reaching its conclusion that respondent was unfit.
Next, the dissent argues that the trial court improperly based its conclusions on an erroneous conception that there was evidence that K.H. had been abused by multiple paramours because the trial court, while making its findings at the best interest phase of the proceedings, used the plural word "paramours" a single time. However, we note that respondent testified at trial that she had been involved in "violent relationships," also plural. Thus, at the very least, there was evidence that respondent, as opposed to K.H., had been abused by multiple paramours.[1] Moreover, we are not convinced that the trial court's isolated comment demonstrates any kind of misconception. The comment referred to by the dissent that K.H. was "[a]bused by paramours" came in the context of the trial court's discussion of the strength of the bond between respondent and K.H. The trial court stated:
"[T]here's no doubt that there's a bond between you and [K.H.] And you must have done something right in those early years to raise such a little girl who can still love and still find attachment in a family and still love you at the same time and her grandma and grandpa and J.J. And she's been in and out of grandma's house, in and out of foster care, in and out of your house. Abused by paramours *1124 She knows thatI believe she probably knows that you've made mistakes, and yet she adores you."
In our view, the use of the word "paramours" in this context is too isolated to support the conclusion that the trial court misunderstood the evidence.
Finally, according to the dissent, we conclude that respondent "suffered from overwhelming psychological problems that impeded her ability to protect her child." Op. 281 Ill.Dec. at 837, 804 N.E.2d at 1132. What we have actually concluded is that the trial court had adequate basis to find that respondent's counseling tasks were reasonably related to remedying the condition that was the basis for K.H.'s removal and that respondent failed to substantially complete these tasks. Our supreme court has stated that "where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress * * * includes the failure to `substantially' fulfill the terms of that service plan." C.N., 196 Ill.2d at 217, 256 Ill.Dec. 788, 752 N.E.2d 1030. The trial court's conclusion that respondent failed to adequately address her problems with domestic violence through her service plan tasks was not against the manifest weight of the evidence.
Next, we address respondent's contention that the trial court erred in its determination that it was in K.H.'s best interests to terminate respondent's parental rights. Respondent specifically points to the testimony regarding the bond and love between respondent and K.H. as a sufficient reason not to terminate her parental rights. While we recognize that bond, we disagree.
A trial court's decision on the best interests of a child will not be reversed unless it is against the manifest weight of the evidence. In re DM., 336 Ill.App.3d 766, 772, 271 Ill.Dec. 86, 784 N.E.2d 304 (2002).[2] Respondent argues that the strength of the mother-child bond trumps any other considerations in this matter. We note, however, that the existence of a mother-child bond "does not automatically insure that the parent will be fit or that the child's best interests will be served by that parent." In re J.B., 198 Ill.App.3d 495, 499, 144 Ill.Dec. 679, 555 N.E.2d 1198 (1990).
Here, the testimony demonstrated that K.H. has settled into her foster home and is adjusting well to it. Staggs testified that K.H. stated that she feels well-loved by her foster parents, and has told respondent how much they love her. In addition, K.H. refers to her foster parents as "Mommy" and "Daddy," and speaks less often of respondent, whom she now regards as an "aunt." Indeed, the testimony taken during the hearing indicated that the necessities of permanency, security, and stability are of great importance in this case. So much so that K.H. became extremely upset merely because a caseworker did not drive the same route to day care as her foster parents did, leading K.H. to believe that she was, once again, being taken to a new home. Based On this testimony, we hold that the trial Court's decision that it was in K.H.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.
*1125 For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.
Affirmed.
GROMETER, J., concurs.
Justice GILLERAN JOHNSON, dissenting:
I respectfully dissent. I believe that this case exemplifies what is wrong with our juvenile court system. I believe that this case reflects a disturbing trend that the State is rushing too quickly to terminate the parental rights of marginally fit and unfit parents and that our juvenile court system is all too willing to acquiesce in this impetuousness. I believe that this system is fostering judges who are not holding the State to its great burden of proof in terminating a person's parental rights. I believe that this system is flawed due to its failure to provide sufficient resources or time to guardians ad litem and defense counsel, who, hence, are greatly limited in providing adequate representation for children or their parents in termination proceedings. I also believe that our juvenile court system is plagued because of its reliance at termination hearings on the testimony of some caseworkers who have lost objectivity and are all too willing to close the door on one child's relationship with her parents and to move on to the next case. In essence, I believe that this case demonstrates that many in our juvenile court system have lost sight of the fact that a parent's right to the care, custody, and control of her child is a fundamental right which should not be easily interfered with (Wickham v. Byrne, 199 Ill.2d 309, 317, 263 Ill.Dec. 799, 769 N.E.2d 1 (2002)), let alone easily terminated (In re M.H., 196 Ill.2d 356, 362-63, 256 Ill.Dec. 297, 751 N.E.2d 1134 (2001)).
The record in this case reveals that the State chose to initiate termination proceedings in the most rapid of fashions for the most minimal of reasons.[3] On October 7, 1999, the respondent's daughter, K.H., was adjudicated neglected after it was determined that she had been physically abused by the respondent's boyfriend, Eddie Golden.[4] K.H. was removed from the *1126 respondent's custody and a service plan was developed for the respondent. The service plan required the respondent to take parenting classes, have a psychological examination, maintain contact with DCFS, participate in domestic violence counseling, and maintain stable housing for herself and her daughter. However, the respondent's caseworkers explained that the respondent's case was essentially just a domestic violence case. Indeed, the respondent's first caseworker, Anna Wells, testified that a psychological examination was made part of the respondent's objectives even though DCFS did not really believe that such an examination was necessary.
The record reveals that the respondent sufficiently complied with her service plan, such that K.H. was returned to her on December 19, 2000. Caseworker Peterson testified that the respondent visited regularly with K.H. and K.H. enjoyed these visits. The respondent also received satisfactory marks for attending 90% of her parenting classes, having a psychological examination in July 2000, continuing with domestic violence counseling, and maintaining stable housing.
The record further reveals that, on January 8, 2001, Eddie Golden unfortunately injured K.H. again while the respondent was working the 2 p.m. to 10 p.m. shift at a nursing home. The respondent met with her caseworker the following day and informed her of this abuse. The respondent subsequently moved out of her residence until Golden was arrested. DCFS did not find that K.H. was in any further danger as it allowed her to remain in the respondent's custody. Caseworker Peterson explained that, because Golden was "out of the home[,] the risk of [K.H.] being harmed again was gone."
K.H. continued to live with the respondent until July 5, 2001, when the respondent was evicted from her apartment because she had become delinquent in her rent payments. The respondent explained that she had become delinquent in her rent when she had to take a leave of absence from her work to care for her children. The respondent then sent K.H. to live with K.H.'s grandmother, of whom DCFS approved.
On October 22, 2001, Marcia Staggs became the respondent's caseworker. She was apparently unimpressed with the amount of the respondent's progress and was highly critical of her. In her first case review of the respondent, Staggs rated the respondent unsatisfactorily for, among other things, choosing violent "paramours" over her children. However, Staggs later acknowledged that she "did not reside with [the respondent], so [she did not] know exactly who her paramours were and exactly * * * whether they were abusive or not." She also acknowledged that she had not done a background check to determine if the respondent's new boyfriend had any issues of abuse in the past.
Staggs also rated the respondent unsatisfactory for not completing a domestic violence program between October 2001 and March 2002. Staggs acknowledged, however, that between December 26, 2001, and February 8, 2002, the respondent participated in intensive domestic violence counseling at A Safe Place, a crisis center in Waukegan that primarily provides domestic violence counseling. Staggs explained that the respondent was cooperative during the 42 days she physically resided at A Safe Place. The *1127 respondent attended the mandatory meetings that were necessary for her continued participation in the program and participated in "all the services that A Safe Place offered." Staggs further acknowledged that this was the respondent's most successful period of cooperating with her service plan recommendations while she was the respondent's caseworker. Nonetheless, Staggs gave the respondent a negative review during this time frame because, considering the whole six-month period, she did not believe that the respondent had sufficiently participated in domestic violence counseling.
On April 2, 2002, less than two months after the respondent had participated in an intensive domestic violence program, less than four months after K.H. had been removed from the custody of the respondent's family, and only nine months after K.H. had stopped residing with the respondent, the State filed its petition to terminate the respondent's parental rights. Based on the facts of this case, I find it disturbing that the State filed its petition to terminate so quickly. My inability to understand this urgency is further heightened due to the minimal evidence that the State ultimately presented at the termination hearing to support its petition. The State's petition alleged that the respondent was unfit because she (1) failed to protect her daughter from conditions injurious to the child's welfare; (2) failed to make reasonable efforts to correct the conditions which were the basis of removal; and (3) failed to make reasonable progress toward the return of the child. See 750 ILCS 50/1(D)(g), (D)(m)(i), (D)(m)(iii) (West 2002).
The basis for the State's petition was essentially Staggs' determination that the respondent was not complying with her service plans. The last evaluation Staggs completed of the respondent before the State filed its termination petition indicated that the respondent was failing to comply with four areas of her service plan: (1) maintaining a lifestyle free of domestic violence and successfully completing a domestic violence program; (2) demonstrating appropriate parenting and successfully attending a parenting program; (3) demonstrating improved mental health and successfully attending mental health counseling; and (4) maintaining the same job, obtaining housing, and paying off $3,000 in debts. I believe that the State failed to prove by clear and convincing evidence that any of these alleged deficiencies of the respondent were grounds to find that the respondent was an unfit parent. Because the State failed to present clear and convincing evidence that the respondent was unfit, the trial court's ultimate finding that she was unfit was against the manifest weight of the evidence. See In re F.S., 322 Ill.App.3d 486, 493, 255 Ill.Dec. 551, 749 N.E.2d 1033 (2001) (determining that because State failed to prove by clear and convincing evidence that mother failed to make reasonable efforts and reasonable progress towards correction of conditions that led to removal of child within nine months of the neglect adjudication, trial court's finding of unfitness was against the manifest weight of the evidence); In re C.M., 305 Ill.App.3d 154, 166, 238 Ill.Dec. 422, 711 N.E.2d 809 (1999) (same).
First, I believe that the State failed to establish that the respondent was not living a lifestyle free of domestic violence. Staggs rated the respondent unsatisfactorily in this regard even though the respondent had recently participated for 42 days in an intensive domestic violence program. Staggs also complained that the respondent did not participate in domestic violence counseling as much as she could have. Staggs also rated the respondent unsatisfactorily because she "chose her *1128 paramours over her children." However, in explaining that the victim was not living a lifestyle free of domestic violence, Staggs acknowledged that, during the time frame at issue, she was unaware of any incidents of the respondent being the victim of domestic violence. Staggs further acknowledged that, although she believed that the respondent's greatest issue in the case was "hooking up with paramours that were abusive," she was not aware if the respondent's current "paramour" had been abusive to her.[5] She also acknowledged that the respondent had not resumed her relationship with Eddie Golden after he had been released from prison.
Such testimony is insufficient to suggest that the respondent was living a lifestyle as the victim of domestic violence or that she was unable to protect her child from such violence. In finding that the respondent was unfit, the trial court placed great weight on Staggs' conclusion that the respondent was choosing her "paramours" over her children as the trial court repeated this idea in its oral findings. However, the evidence that was presented at the hearing does not support this finding. The record reveals that the respondent was involved in only one abusive relationship since DCFS became involved with the case, that being with Eddie Golden. After the incident of abuse on January 2001, the respondent told her caseworker about the incident the next day when questioned about K.H.'s injury. The respondent then moved out of her residence until Golden was arrested. Although the respondent maintained minimal verbal communication with Golden and visited him at jail, she never allowed Golden to see K.H. again. She also did not resume a relationship or cohabitate with Golden after he was released from prison. The respondent explained that she ended her relationship with Golden because she was choosing K.H. over Golden. The record supports this testimony. The record is also devoid of any evidence that the respondent was involved in any other abusive relationships after she ended her relationship with Golden. Staggs' opinion therefore that the respondent chose abusive "paramours" over her children was not based on any evidence, and the trial court's reliance on such testimony was improper,
Moreover, in reviewing the record, as a whole, I do not believe that it supports the majority's conclusion that the respondent was failing to make reasonable progress in addressing issues of domestic violence. The majority emphasizes that the respondent did not participate in any domestic violence counseling for 11 months in 2001. The respondent explained, however, that she had stopped going to counseling because her counselor had told her that she could stop when she wanted to. The respondent testified consistently to this fact under cross-examination, and the State did not call any witnesses to rebut her testimony. Moreover, the trial court made no *1129 findings at the close of the hearing that indicated that it did not find the respondent's testimony credible on this issue.[6]
More importantly, the record does reveal that the respondent participated for 42 straight days in an intensive 45-day domestic violence program from December 2001 to February 2002. The respondent participated for these 42 days shortly after K.H. was removed from the respondent's mother's custody and shortly before the State filed its termination petition. The respondent's completion of 93% of a 45day domestic violence program demonstrates that the respondent was making great attempts to comply with her service plan recommendations.
I also find that the State failed to establish by clear and convincing evidence that the respondent was unfit because she failed to take additional parenting classes and to submit to mental health evaluations and counseling. Failure to comply with service plans may be grounds to find that a parent is unfit for not making reasonable progress towards correcting the conditions that were the basis of the removal of the child. See In re R.E., 317 Ill.App.3d 227, 232, 250 Ill.Dec. 538, 738 N.E.2d 1007 (2000). However, the focus of a parent's progress goals and service plans should remain upon his or her abilities relative to the child's needs. In re D.D., 309 Ill. App.3d 581, 589, 243 Ill.Dec. 365, 723 N.E.2d 397 (2000). An agency should not require superfluous services that shift the parent's concentration from remedying deficiencies to jumping through administrative hoops. D.D., 309 Ill.App.3d at 587-88, 243 Ill.Dec. 365, 723 N.E.2d 397. Failure to comply with such superfluous services that are not reasonably related to some parental shortcoming is not grounds to find that a parent is unfit. See D.D., 309 Ill.App.3d at 588, 243 Ill.Dec. 365, 723 N.E.2d 397.
Here, as noted above, the respondent's caseworkers stated that the respondent's case was essentially a domestic violence case. Their only concern with her parenting was regarding domestic violence. Caseworker Wells testified that when the respondent's original service plan was created, certain requirements were added, such as getting a psychological exam, even though DCFS did not believe that such an exam was necessary. Caseworker Peterson explained that new objectives were added for the respondent after K.H. was returned home because that was "just part of [her agency's] program." Staggs explained that because K.H. was returned to foster care, additional parenting classes were added to the respondent's service plan, even though she had successfully completed a parenting program in the past.
The record reveals that many of the goals that were created for the respondent, and that she failed to complete, were superfluous. Although all of her caseworkers identified domestic violence concerns as the greatest issue facing the respondent, additional objectives were added just because that was part of DCFS's program. None of the caseworkers identified any significant problems with the respondent's parenting skills other than the incidents involving Eddie Golden. Although I do not question that it would have been preferable for the respondent to take more *1130 parenting classes, based on these circumstances, the fact that she did not was not grounds to find that she was unfit.
As to the respondent's alleged mental health problems, the State presented little evidence. Although a psychological examination had been performed on the respondent in July 2000, the State never sought to admit into evidence the results of this examination. The State elicited from Peterson that after the respondent completed the psychological exam, she complied with the accompanying recommendations to have therapy for self-esteem and domestic violence issues. However, Peterson did not testify as to the severity of the respondent's condition or as to the overall content of the psychological report. Staggs, without being asked about the psychological report, volunteered that the "psychological addressed the dependent personality." Staggs was also never asked to elaborate on her comments or to explain the seriousness of the respondent's dependent personality condition. Based on the State's minimal evidence in this regard, the State failed to establish that the respondent's requirement to participate in additional mental health counseling was reasonably related to any parental shortcoming. See D.D., 309 Ill.App.3d at 588, 243 Ill.Dec. 365, 723 N.E.2d 397. Although I do not question that it would have been desirable for the respondent to obtain additional mental health counseling, the State failed to demonstrate how K.H. would be harmed if the respondent failed to do so.
Furthermore, I note that Staggs rated the respondent unsatisfactorily for not being able to maintain steady employment and stable housing. It is obvious from the record that the respondent had problems in these areas because she is poor and not well-educated. Based on the circumstances of this case, the respondent's poverty was not a proper basis to find her unfit. See In re Nesbitt, 147 N.C.App. 349, 359, 555 S.E.2d 659, 665-66 (2001) (parent's poverty is not a legitimate basis on which to terminate his parental rights).
Accordingly, I believe that the State failed to present clear and convincing evidence that the respondent was an unfit parent, especially in light of the evidence which indicated that the respondent was a fit parent. The record reveals that respondent visited K.H. regularly and that they had a good relationship. The respondent completed a parenting class and six intensive weeks of domestic violence counseling. The respondent had found a fulltime job and was in a better position to support her child. The record also demonstrates that the respondent had a strong bond with her daughter and that she was working to regain custody of her child. As such, for all these reasons, I believe that the record clearly demonstrates that the trial court's finding that the respondent was unfit was against the manifest weight of the evidence. See F.S., 322 Ill.App.3d at 493, 255 Ill.Dec. 551, 749 N.E.2d 1033; C.M., 305 Ill.App.3d at 166, 238 Ill.Dec. 422, 711 N.E.2d 809.
I note that the majority dismisses many of my concerns about this case based on its determination that I have not employed the proper standard of review. I acknowledge that based on my astonishment at the minimal evidence presented by the State, especially as to some of its witnesses' testimony, I have commented on some of the witnesses' testimony to a greater extent than general principles of review dictate. However, as is evident from even a cursory review of this dissent, my review of the judgment in this case has been guided by the fundamental principle that a reviewing court cannot determine whether a trial court's decision is against the manifest weight of the evidence without considering whether the prosecuting party carried its *1131 burden of proof. See In re D.T., 338 Ill.App.3d 133, 154-55, 272 Ill.Dec. 829, 788 N.E.2d 133 (2003) (determining that because State failed to carry its burden of proof that termination of the respondent's parental rights was in the child's best interests, the trial court's decision terminating the respondent's rights was against the manifest weight of the evidence). Accordingly, if the State's evidence was not clear and convincing, it cannot withstand review on appeal. See D.T., 338 Ill.App.3d at 155, 272 Ill.Dec. 829, 788 N.E.2d 133. Furthermore, it is fundamental that a reviewing court must consider all the evidence presented to the trial court to determine if its decision was against the manifest weight of the evidence. General Foods Corp. v. Hall, 39 Ill.App.3d 147, 153, 349 N.E.2d 573 (1976). If the record clearly demonstrates that the trial court should have reached the opposite conclusion, the trial court's order must be reversed. See D. T., 338 Ill.App.3d at 154, 272 Ill.Dec. 829, 788 N.E.2d 133. Based solely upon the application of these fundamental principles of appellate review to the case before us, and considering the great deference to which the trial court's decision is entitled (see In re Brown, 86 Ill.2d 147, 152, 56 Ill.Dec. 4, 427 N.E.2d 84 (1981)), I conclude, for the reasons explained above, that the State failed to establish by clear and convincing evidence that the respondent was unfit. As such, the record clearly demonstrates that the trial court's determination that the respondent was unfit is against the manifest weight of the evidence. See D. T., 338 Ill.App.3d at 155, 272 Ill.Dec. 829, 788 N.E.2d 133.
The State's paucity of evidence in this case corresponds with my initial observations that the State rushed too quickly to terminate the respondent's parental rights. In doing so, the State's presentation of evidence was careless as it left many questions about the respondent's parental abilities unanswered. For example, as noted above, there were some references in the caseworkers' testimony to concerns about the respondent's mental health based on her psychological exam. However, the State never sought to admit into evidence this psychological report. The State never sought to subpoena the doctor who conducted the examination. Rather, the State relied on the hearsay testimony of two of the respondent's caseworkers as to the respondent's psychological condition. These caseworkers provided only some vague testimony that the respondent had self-esteem issues and a dependent personality. However, the State never had these caseworkers testify as to the severity of the respondent's condition. The caseworkers did not testify as to whether the respondent's condition could be addressed in a few counseling sessions or whether the respondent's condition would require her to participate in life-long therapy. The State did not even have the caseworkers testify as to how the respondent's psychological condition differed from that of anyone else in the general population of this country.
In response to this shortcoming in the State's case, I note that neither the respondent's attorney nor the guardian ad litem objected to this improper hearsay testimony. Based on the magnitude of the issues involved in a termination of parental rights case, I believe that it is incumbent that attorneys representing a natural parent and the child in such a proceeding demand that all procedural safeguards be adhered to. See Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640, 650 (1981) (determining that a parent is entitled to effective representation of counsel in a termination proceeding because "[a] parent's interest in the accuracy and justice of the decision to terminate his or her *1132 parental status is * * * a commanding one"). It is unacceptable for attorneys representing a child and a natural parent to acquiesce to the State's careless and improper presentation of evidence that calls into question both the accuracy and justice of terminating one's parental rights. See Lassiter, 452.U.S, at 27, 101 S.Ct. at 2160, 68 L.Ed.2d at 650.
In response to this minimal evidence that the State presented at the fitness hearing as to the respondent's psychological condition, the majority nonetheless concludes that the respondent suffered from overwhelming psychological problems that impeded her ability to protect her child. The majority then reasons that the respondent had to do more than just end her relationship with Golden to address her domestic violence concerns; she had to address her psychological problems.
In reality, the respondent's first two caseworkers viewed the respondent's need for domestic violence counseling as based on her relationship with Golden more than anything else. Caseworker Wells testified about the respondent's domestic violence issues always in the context of her relationship with Golden. It is apparent that Wells believed that domestic violence concerns were a "continuing ongoing issue" for the respondent, because during the time that Wells was her caseworker, the respondent was maintaining her relationship with Golden. Wells never testified that the respondent was suffering from any psychological problems that prevented her from adequately parenting or protecting her child.
Caseworker Peterson testified similarly to Wells. Peterson explained that Golden was the primary concern because he was the one who had injured K.H. in the past. Peterson also testified that none of the incidents at issue ever involved the respondent striking K.H. She additionally testified that the respondent had completed a psychological examination and had complied with the accompanying recommendations to have therapy for self-esteem and domestic violence issues. She did not testify further as to the content of the recommendations of the psychological examination. She never testified to what degree, if any, the respondent's supposed psychological problems were a hindrance to her parenting K.H.
As the majority emphasizes, Staggs testified that the respondent's psychological report addressed her dependent personality. However, Staggs' testimony is less than helpful in providing insight into the extent of the respondent's supposed psychological problems. Staggs made her comment at issue in explaining why she disapproved of the respondent moving in with a new boyfriend after the respondent's participation in an intensive domestic violence program. Staggs stated:
"It appeared to be the biggest issue in this case, hooking up with paramours that were abusive. So the concern was for her to become independent. The psychological addressed also the dependent personality. Learning how to become independent and take care of herself and take care of her children."
First, looking at this statement in its immediate context, its significance is questionable because, Staggs refers to the respondent's psychological report immediately after describing the respondent's biggest issue in the case as "hooking up with paramours that were abusive." However, as discussed above, when given the opportunity to substantiate this serious accusation, Staggs failed to do so. Instead, she acknowledged that she did not know who the respondent's "paramours" were and whether they were abusive or not.
Second, Staggs was never asked to elaborate as to the extent of the respondent's *1133 dependent personality condition. She did not explain the seriousness of this condition, such as whether it could be addressed in a few counseling sessions or whether it would require the respondent to participate in life-long therapy. Such questions could have perhaps been resolved had the State introduced this psychological report into evidence. These questions could also have been resolved had the State actually questioned Staggs about the respondent's psychological condition. As noted above, however, the State did neither.
Furthermore, Staggs' limited testimony on this point suggests that the respondent's dependent personality condition was not that severe. Staggs indicated that the respondent's condition affected her ability to become independent and take care of herself. However, the record reveals that by the time of the termination proceedings, the respondent had demonstrated an ability to take care of herself, as evidenced by her ability to find steady employment.
In light of the dearth of evidence that the State presented as to the respondent's psychological condition, the majority's conclusion that the respondent had to extricate herself from a lifestyle of domestic violence by "successfully address[ing] her issues, psychological or otherwise, that led her to repeatedly allow her daughter to become a victim of domestic violence" (slip op. at 20) is flawed. As noted above, none of the caseworkers' testimony nor any other evidence submitted by the State at the fitness hearing suggested that the respondent's psychological condition was why her child was removed or why her parental rights should be terminated. Instead, the record reveals that, for the majority of the case, the respondent's caseworkers were primarily concerned about the respondent exposing K.H. to abuse by Golden. Thus, after the respondent ended her relationship with Golden, she demonstrated great progress in addressing this concern.
In response to these concerns about the State's minimal evidence as to the respondent's alleged psychological problems, the majority advances two incoherent, illogical, and contradictory positions. First, the majority falsely claims that I do "not consider Staggs' and Peterson's testimony regarding respondent's psychological condition because it is hearsay." Op. 281 Ill. Dec. at 826, 804 N.E.2d at 1121. The majority then criticizes my supposed refusal to consider this evidence because "`[i]t is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its and natural probative effect.'" Op. 281 Ill.Dec. at 827, 804 N.E.2d at 1122, quoting Jackson v. Board of Review of the Department of Labor, 105 Ill.2d 501, 508, 86 Ill.Dec. 500, 475 N.E.2d 879 (1985). However, as is evident from even a cursory review of my above comments, I considered Staggs' and Peterson's hearsay testimony and found it to be insufficient to support the majority's conclusion that the respondent was suffering from great psychological problems. I also stressed that the respondent's attorney, or at least the guardian ad litem, should have objected to the improper hearsay testimony for exactly the reasons set forward in Jackson.
Furthermore, while claiming that I did not consider the caseworkers' hearsay testimony, the majority then simultaneously claims that I did consider that evidence and that I determined that the respondent's "caseworkers lied about the psychological report." Op. 281 Ill.Dec. at 827, 804 N.E.2d at 1122. Again, as is evident from my above comments, I made no finding as to the caseworkers' credibility in testifying to the respondent's alleged psychological problems. The majority's insistence to the contrary is nothing more than *1134 a futile attempt to divert attention from the great weight it places on the respondent's alleged psychological problems, a determination that is not supported by the record.
I also find flawed the majority's insistence that it would have been "pointless" for any of the attorneys to object to the caseworkers' testimony as to the respondent's alleged psychological problems as hearsay or as lacking a sufficient foundation. Such an objection would not have been pointless as it would have required the State to either admit the respondent's psychological report or call the administering doctor to testify, thereby demonstrating the severity, or lack thereof, of her psychological problems. The majority concludes to the contrary, however, speculating that "[t]he most obvious reason for respondent's failure to object to the caseworkers' testimony is that their testimony was consistent with the psychological report." Op. 281 Ill.Dec. at 826, 804 N.E.2d at 1121. The majority's conculsion may have been proper had the respondent's psychological report been included as part of the record on appeal, allowing this court to review exactly what the psychological report entailed. However, because the report is not part of the record, this court cannot fairly say whether an objection to this testimony would have been "pointless." The majority's conclusion to the contrary, therefore, is based on nothing more than conjecture and is clearly wrong.
The majority further disparages my concerns about the attorneys' failure to object to this improper evidence by going so far as to make the grandiose claim that I am creating a "new rule that appellate courts must, without so much as a request by a party, reverse a trial court's decision because of a lawyer's failure to make a hearsay objection would truly revolutionize appellate standards of review." Op. 281 Ill. Dec. at 827, 804 N.E.2d at 1122. Notwithstanding this melodramatic language, the majority's claim is nothing more than vacuous rhetoric to conceal a glaring shortcoming in its analysis.
In reality, I am not advocating a new rule for attorneys. Rather, I am imploring all attorneys in termination proceedings, particularly those representing a natural parent or child, to provide the zealous representation that they are obligated to render. Such an admonition is not a novel concept but rather correlates to the wellsettled law that an attorney is expected to provide effective representation to a party in a termination case. See Lassiter, 452 U.S. at 27, 101 S.Ct. at 2160, 68 L.Ed.2d at 650, see also In re R.G., 165 Ill.App.3d 112, 127, 116 Ill.Dec. 69, 518 N.E.2d 691 (1988) (explaining that counsel for indigent parents in termination proceedings are expected to perform effectively). Furthermore, although I would hope that attorney would be zealous in representing all of their clients, I believe that such representation is especially required in cases such as these, which so drastically impact a mother's right to raise her child. See In re F.S., 322 Ill.App.3d 486, 489, 255 Ill.Dec. 551, 749 N.E.2d 1033 (2001) (explaining that termination of parental rights is a drastic action which deprives a parent of rights that are fundamental and as ancient as mankind).
I further note that the majority's accusation that I am advocating that the trial court's order be reversed "without so much as a request by a party * * * because of a lawyer's failure to make a hearsay objection" (op. 281 Ill.Dec. at 827, 804 N.E.2d at 1122) is both factually inaccurate and legally unsound. First, I am not advocating that the trial court's order be reversed on this basis. Rather, I believe that the trial court's order should be reversed *1135 because it was against the manifest weight of the evidence. Moreover, in deriding an argument that I do not even put forward, the majority's criticism is legally flawed. The majority conveniently overlooks that the respondent's attorney on appeal was also her attorney at the termination hearing. As such, the respondent's attorney could not be expected to argue his own ineffectiveness. See People v. Gustafson, 75 Ill.App.3d 497, 502, 31 Ill. Dec. 8, 393 N.E.2d 1315 (1979) (noting that an appointed trial attorney cannot be expected to argue his own ineffectiveness at a postconviction proceeding). Rather, in such a situation, it is within this court's power to raise sua sponte an issue that appears in the record, including possible instances of ineffective assistance of trial counsel, to ensure that justice is done. See Hux v. Raben, 38 Ill.2d 223, 224-25, 230 N.E.2d 831 (1967) (explaining that reviewing court properly decided case on a ground not raised by the parties in order to ensure a just result and to maintain a sound and uniform body of precedent). The majority's implicit contention to the contrary therefore is wrong.
Furthermore, to the extent that the majority's speculation is accurate that the respondent's psychological report contained negative information about the respondent, I agree that such a fact could excuse the respondent's attorney's failure to object to the hearsay testimony on a basis of trial strategy. See People v. Richardson, 189 Ill.2d 401, 411, 245 Ill.Dec. 109, 727 N.E.2d 362 (2000). However, such a fact scenario would not excuse the guardian ad litem's failure to object to this testimony, another fact that the majority conveniently ignores. The guardian ad litem was charged with looking out for the best interests of K.H. See In re Marriage of Klebs, 196 Ill.App.3d 472, 483, 143 Ill. Dec. 363, 554 N.E.2d 298 (1990) (role of guardian ad litem is to safeguard and protect the interests of the child). If the respondent's psychological report demonstrated that she had psychological problems that hindered her ability to parent K.H., the guardian ad litem should have moved to introduce the report or insisted that the report be admitted into evidence as demonstrating the respondent's parental unfitness. Alternatively, if the psychological report revealed that the respondent had no severe psychological problems, the guardian ad litem should have demanded that the psychological report be admitted into evidence as a demonstration of the respondent's parental fitness. See In re Dominique F., 204 Ill.App.3d 271, 275-76, 149 Ill.Dec. 544, 561 N.E.2d 1240 (1990) (attorney appointed to represent interests of minor stands in the same position as any other attorney before court and enjoys no special status but rather is obligated to pursue all avenues which serve or protect best interests of his client). In neither scenario can the guardian ad litem's failure to object to testimony based on the nonadmitted psychological report be deemed as "pointless" or anything but improper.
Beyond my concern about the majority's reliance on the nonexistent evidence of the respondent's overwhelming psychological problems, I also find troubling that the majority seeks to bolster its affirmation of the trial court's decision by relying on "evidence" that the respondent was abused by multiple "paramours." Such evidence, by implication, would demonstrate that the respondent was less likely to be able to protect herself and K.H. from physical abuse. However, the State never introduced any such evidence. The majority attempts to overcome this fact by pointing to the respondent's testimony in which she acknowledged that she had been involved in violent relationships in the past. From this testimony, the majority extrapolates *1136 that because the respondent had acknowledged "that she had been involved in `violent relationships,'" "at the very least, there was evidence that respondent * * * had been abused by multiple paramours." Op. 281 Ill.Dec. at 828, 804 N.E.2d at 1123. The majority's conclusion is necessarily speculative. Being involved in a violent relationship cannot be equated with being involved with a violent paramour. This is because a "relationship" has a much broader connotation than referring to just "paramours." One could be involved in a violent relationship without being involved with a paramour. For example, the respondent could have had a violent relationship with one of her parents or siblings during her childhood. She may have had a violent relationship with an employer or a coworker. She may have had a violent relationship with one of the residents at the nursing home where she was working. I note that the respondent was never asked to clarify what she meant by her remark. As such, in relying on this conjecture to support its decision, the majority contradicts its self-pronounced declaration that it is limiting its analysis to "decid[ing] this case based on the record." Op. 281 Ill.Dec. at 823,804 N.E.2d at 1118.
The majority's analysis also strays from relying solely on the record when it places great weight on a "custody hearing and two permanency hearings that are * * * not part of the record on appeal." Op. 281 Ill.Dec. at 824, 804 N.E.2d at 1119. The majority explains that these missing records of proceedings entitle the trial court's decision to greater deference because it was able to consider the records of additional proceedings that this court is not. To utilize such a concept in this case, however, essentially undermines the principle of appellate review. Such an approach requires this court to assume that there is evidence outside the record supporting the trial court's decision. I note that generally if the record is incomplete, its incompleteness will be construed against the appellant, which in this case is the respondent. See Foutch v. O'Bryant, 99 Ill.2d 389, 392, 76 Ill.Dec. 823, 459 N.E.2d 958 (1984). However, the application of that rule is improper in this case because the missing part of the record does not deprive the court of the ability to decide the issues raised by the respondent. Based on the sufficiency of the record that has been preserved for appeal, it is inappropriate to speculate as to what transpired at those hearings which are not part of the record on appeal.
I note that there is a possibility that all of the majority's speculation is correct. It is possible that the respondent has serious psychological problems that greatly impede her ability to care for and to protect her daughter. It is also possible that the respondent associates with multiple abusive paramours who directly threaten K.H.'s safety. However, because the State did not produce any such evidence at the fitness hearing, or any other clear and convincing evidence that demonstrated that the respondent was an unfit parent, it is inappropriate to affirm the trial court's order. Rather, this court should reverse the trial court's decision. At that point, the State could file another petition to terminate the respondent's parental rights. See In re A.H., 207 Ill.2d 590, 594, 280 Ill.Dec. 290, 802 N.E.2d 215 (2003) (determining that Juvenile Court Act contemplates filing more than one petition to terminate parental rights). At a hearing on that petition, the State could then present additional evidence that was not presented in the instant case. Another possible remedy is for this court to remand the case with directions that the trial court reopen the proofs. The parties would then have the opportunity to present additional evidence, *1137 such as regarding the respondent's psychological condition and her history of, or lack thereof, associating with abusive boyfriends. Either one of these remedies is more just and appropriate than the majority's resolution of this case, which permanently severs the bond between a mother and child based on less than clear and convincing evidence.
Turning next to whether the trial court erred in finding that it was in the child's best interests that the respondent's parental rights be terminated, I first note that the majority elects to employ a manifest weight of the evidence standard in reviewing the trial court's decision. See op. 281 Ill.Dec. at 829, 804 N.E.2d at 1124. As the majority alludes, the proper standard of review to be used for this stage of a termination hearing is not well settled. See In re D.M., 336 Ill.App.3d 766, 772, 271 Ill. Dec. 86, 784 N.E.2d 304 (2002) (determining that trial court's finding that termination of a parent's rights is in the child's best interests will not be reversed unless it is against the manifest weight of the evidence); In re M.F., 326 Ill.App.3d 1110, 1115-16, 261 Ill.Dec. 132, 762 N.E.2d 701 (2002) (same); In re M.S., 302 Ill.App.3d 998, 1003, 235 Ill.Dec. 969, 706 N.E.2d 524 (1999) (using abuse of discretion standard for this stage of the proceedings); In re G.L., 329 Ill.App.3d 18, 25, 263 Ill.Dec. 607, 768 N.E.2d 367 (2002) (determining that trial court's decision at this stage of the proceedings will not be disturbed unless it was contrary to the manifest weight of the evidence or the trial court otherwise abused its discretion). Our supreme court has held that manifest weight of the evidence and abuse of discretion are different and distinct standards of review. See People v. Andrews, 146 Ill.2d 413, 428, 167 Ill.Dec. 996, 588 N.E.2d 1126 (1992). Our supreme court has also recognized that the abuse of discretion standard is "`the most deferential standard of review available with the exception of no review at all.'" People v. Coleman, 183 Ill.2d 366, 387, 233 Ill.Dec. 789, 701 N.E.2d 1063 (1998), quoting M. Davis, A Basic Guide to Standards of Judicial Review, 33 S.D. L.Rev. 469, 480 (1988). As such, manifest weight review is less deferential than abuse of discretion review. Clay v. County of Cook, 325 Ill.App.3d 893, 901, 259 Ill.Dec. 526, 759 N.E.2d 6 (2001). Based on the fundamental right that a parent has to the care, custody, and control of her child (see Wickham v. Byrne, 199 Ill.2d 309, 317, 263 Ill.Dec. 799, 769 N.E.2d 1 (2002)), I believe that the trial court's ruling terminating a parent's right to that child should be able to withstand greater scrutiny than an abuse of discretion standard. I therefore will also review the trial court's decision under the manifest weight of the evidence standard to determine if it was in K.H.'s best interests that the respondent's rights be terminated. See D.T., 338 Ill.App.3d at 155, 272 Ill.Dec. 829, 788 N.E.2d 133.
Because I believe that the trial court's determination that the respondent was unfit was against the manifest weight of the evidence, I also believe that its decision on K.H.'s best interests was against the manifest weight of the evidence. See Wickham, 199 Ill.2d at 318-20, 263 Ill.Dec. 799, 769 N.E.2d 1 (presumption that parents who are fit act in the best interests of their children). Furthermore, I believe that the trial court's finding in this regard was also improper because the State's evidence on K.H.'s best interests was not sufficient. The only witness to testify at the hearing was Staggs.[7] She testified that K.H. was *1138 living with foster parents who loved her and provided her a stable home. She acknowledged that there was a strong bond between the respondent and K.H., but suggested that the respondent's parental rights nonetheless should be terminated because the respondent put others first, which placed K.H. in jeopardy. The trial court agreed, finding that, although the respondent loved K.H., the respondent had kept K.H. living in limbo by exposing her to abusive "paramours." The trial court also found that the respondent's association with other "paramours" demonstrated that she could not care for K.H.
Again, as explained above, I believe that the record is devoid of evidence that K.H. was abused by multiple "paramours" of the respondent. The record reveals that the only boyfriend of the respondent's who abused K.H. or the respondent was Eddie Golden, a person with whom neither the respondent nor K.H. still had a relationship. The record also does not show that the respondent's association with any other boyfriends threatened K.H.'s safety or demonstrated that the respondent was unable to care for K.H. Accordingly, I believe that the trial court's rationale for terminating the respondent's parental rights was not supported by the record. Hence, its decision was against the manifest weight of the evidence.[8]
In sum, I find that this is a tragic case. I find that this case is particularly tragic because the trial court's decision, and the majority's affirmation of that decision, has essentially made the respondent, a victim of domestic violence, the victim again. The respondent has become a victim of a court system willing to terminate her parental rights on speculation rather than clear and convincing evidence. I believe that this was a case of neglect and was properly adjudicated as such. It was not a case that warranted the termination of the respondent's parental rights. The respondent was a poor mother doing what she was supposed to be doing, as evidenced by the fact that her child had been returned to her custody. The respondent made significant efforts in complying with her service plan recommendations, such as completing a parenting class, participating in intensive domestic violence counseling, obtaining steady employment, ending her relationship with an abusive boyfriend, and maintaining frequent visitation with her child. Nonetheless, the State filed a termination petition in the most rapid of fashions, less than 2 months after the respondent had participated in an intensive 42 day domestic violence program. Although the State's evidence was minimal, the trial court terminated the respondent's parental *1139 rights anyway. I believe that this is all manifestly unjust. I believe that parents like the respondent, who are poor, have limited education, and are the victims of domestic violence, deserve more respect from the social services agencies and our court system and should not have their parental rights terminated so quickly on such little evidence.
NOTES
[1] The dissent mischaracterizes our use of this evidence when it states, "the majority seeks to bolster its affirmation of the trial court's decision by relying on `evidence' that respondent was abused by multiple `paramours.'" Slip op. at 47. We have raised this point only in response to the dissent's argument that the trial court's use of the plural word "paramours" demonstrates that it became confused.
[2] While some cases have analyzed a trial court's decision on the best interests of a child under an abuse of discretion standard (see, e.g., In re Jeffrey S., 329 Ill.App.3d 1096, 1101, 769 N.E.2d 1114, 264 Ill.Dec. 277 (2002)), we agree with the D.M. court that the manifest weight standard of review is proper where the challenge is to the sufficiency of evidence rather than the admission of evidence. See D.M., 336 Ill.App.3d at 773.
[3] The majority characterizes this statement as indicating that I believe that the repeated physical abuse of K.H. constituted "the most minimal of reasons" for the State to file its termination petition. See slip op. at 19. In other terms, the majority insinuates that I am either indifferent to or minimizing acts of child abuse. Such an insinuation is inaccurate. The majority's insinuation is also based on a false premise, that the State filed its termination petition because of the acts of violence against K.H. If this were the basis for the State's petition, it would not have waited 13 months since the last incident of abuse to file its petition. Rather, it is apparent that the State filed its termination petition based on the respondent's alleged failure to sufficiently comply with her service plans that addressed the prior incidents of abuse. As I will discuss, because the record reveals that the respondent was making reasonable progress with many of her service plans, I believe that the State's decision to proceed on this basis was for the "most minimal of reasons."
[4] Throughout the proceedings, the respondent's caseworkers, and even the trial court, refer to Eddie Golden and the respondent's other boyfriend(s) as her "paramours." The majority also adopts the use of this term in its opinion. I believe that the use of this term unnecessarily portrays the respondent in a negative light. I believe that the use of this term also demonstrates that some of the respondent's caseworkers were biased against her. The term "paramour" suggests that the respondent was engaged in an unlawful or illicit activity. Specifically, the term refers to an illicit lover, especially of a married person, as a man's mistress. See Webster's Encyclopedic Unabridged Dictionary 1047 (1989). There is no indication in the record, however, that the respondent was involved any sexual relationships with any married men or that she was involved in any other illicit activities. Absent any reason in the record to label the respondent as associating with "paramours," I will refer to her boyfriends as such, unless for sake of clarity of the record, it is necessary to refer to them as "paramours."
[5] As the majority states, there is a reference in the record to Staggs observing bruises on one of the respondent's arms. In a report dated September 4, 2002, Staggs wrote that she had "observed bruises on [the respondent's] arm and heard reports that her paramour is abusive." However, nowhere in Staggs' report does she indicate that the respondent's "paramour" had actually inflicted bruises upon the respondent. She merely stated that she observed bruises on the respondent's arm. Nowhere in the record does it indicate that Staggs even asked the respondent where she got the bruises. Moreover, although Staggs stated that she had "heard" that the respondent's paramour was abusive, she did not explain from whom she heard this information. Staggs never testified at trial as to what she meant by this comment. Because of the uncertain and ambiguous nature of this statement, it cannot support an inference that the respondent was associating with an abusive boyfriend or that she was the victim of ongoing domestic violence.
[6] The majority rejects the credibility of the respondent's testimony as to this issue, explaining that her testimony is "self-serving." Slip op. at 17. However, as noted above, the record reveals that the trial court never found the respondent's testimony not credible on this issue. As such, it is improper for the majority to engage in credibility determinations that the trial court itself did not make. See In re Brown, 86 Ill.2d 147, 152, 427 N.E.2d 84, 56 Ill.Dec. 4 (1981).
[7] Much of Staggs' testimony at the best interests hearing was based on hearsay or speculation. However, neither the respondent's attorney nor the guardian ad litem objected to such improper testimony. As explained above, I believe that children, natural parents, and this court "demand a substantially higher level of competency" from attorneys in termination proceedings such as these. See In re Tekela), 202 Ill.2d 282, 295, 780 N.E.2d 304, 269 Ill.Dec. 119 (2002).
[8] The majority acknowledges that the trial court stated that K.H. had been abused by multiple paramours. However, in quoting from that part of the record where the trial court made its statement, the majority concludes that the context of the trial court's statement demonstrates that it did not misunderstand the evidence as to whether K.H. had been abused by multiple "paramours" of the respondent's. The majority's explanation is unconvincing. Considering the same language that the majority quotes in its opinion (see op. 281 Ill.Dec. at 828, 804 N.E.2d at 1123), it is readily apparent that the trial court was considering that K.H. had been abused by multiple paramours when it determined that the respondent's parental rights should be terminated. Because this determination that the respondent's parental rights should be terminated. Because this determination is not based on the record, the trial court's consideration of this purposed fact in terminating the respondent's parental rights is erroneous and grossly unfair to the respondent.