NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190832-U

NOS. 4-19-0832, 4-19-0833 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 1, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.B. and J.P., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Plaintiff-Appellee, | ) | Nos.   15JA185 |
| v. | ) | 15JA186 |
| Karmeletta W., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in terminating respondent's parental rights.

¶ 2     On November 21, 2019, the trial court terminated the parental rights of respondent, Karmeletta W., to her children, I.B. (born April 25, 2009) and J.P. (born April 13, 2013). Respondent appeals, arguing the court's finding that termination of her parental rights was in I.B. and J.P.'s best interest was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In October 2015, the Department of Children and Family Services (DCFS) took protective custody of I.B. and J.P. after respondent, while accompanied by her children, shoplifted from a shopping mall and, once mall staff attempted to detain her, abandoned the children while

she fled.

¶ 5        On October 26, 2015, the State filed petitions to adjudicate wardship, alleging I.B. and J.P. were neglected. On May 12, 2016, after an adjudicatory hearing at which respondent stipulated that the children were not receiving the proper care and supervision necessary for their well-being, I.B. and J.P. were found to be neglected. A month later, the court entered a dispositional order finding respondent was unfit, unable, or unwilling to care for, protect, train, educate, supervise, or discipline I.B. and J.P. The court made I.B. and J.P. wards of the court and placed them in the custody and guardianship of DCFS.

¶ 6        DCFS instituted a service plan which included several goals for respondent to complete in order to correct the conditions which led to the removal of her children. Specifically, respondent was to participate in parenting classes, counseling and mental health services, and substance abuse treatment. Over the next two years, DCFS periodically reviewed respondent's progress toward completion of her goals. Although, during some reviews, DCFS noted respondent was progressing, at other reviews it was noted respondent was intoxicated during visits with the children, was unsuccessfully discharged from required service programs, and required additional services.

¶ 7        On August 15, 2018, the State filed motions for termination of parental rights. In its motions, the State alleged respondent was unfit to parent I.B. and J.P. and it was in the best interest of the children that the parental rights of respondent be terminated. (We note the State also sought to terminate the parental rights of I.B. and J.P.'s fathers and that, ultimately, their parental rights were terminated; however, those individuals are not parties to this appeal and we discuss the facts only as they relate to respondent.) On March 28, 2019, the trial court entered an order finding

respondent to be an unfit parent, as alleged by the State.

¶ 8        On May 29, 2019, the trial court conducted the first of multiple best interest hearings. The State first called Jacqueline Dean, I.B. and J.P.'s caseworker at the Center for Youth and Family Solutions. According to Dean, when she first became I.B. and J.P.'s caseworker, the children had already been placed with Amber Day, their maternal aunt. I.B. had been placed with Day for approximately two-and-a-half years at the time of the best interest hearing, although he had been removed from Day's home between July 2018 and January 2019. Dean testified that, at Day's request, I.B. had been removed from her home during that time because I.B. and another of Day's six biological children had been in a fight, I.B. bickered with the other children, and I.B. argued with Day. Although I.B. was eventually returned to Day, he continued to get into fights at school and on the school bus, including fights with Day's other children. Dean attributed I.B.'s continuing behavior issues to his involvement in the court proceedings and to wanting to protect J.P. from being picked on by other children. Dean also testified she had no safety concerns about I.B. living in Day's home, she believed I.B. was "making progress" with Day, and I.B.'s grades were improving since he returned to live with Day. According to Dean, Day provided for all of I.B.'s medical needs.

¶ 9        Dean testified that J.P. had been placed with Day since she was removed from respondent. According to Dean, J.P. loved Day and had even told Dean that she "wished that everyone could live with [Day], including [respondent]." Dean testified Day was meeting all of J.P.'s educational, social, and medical needs and that J.P. was doing well in school. However, Dean admitted that I.B.'s temporary removal from Day's home was hard on J.P. and that it caused J.P. to throw "some tantrums." Dean also testified J.P. was exhibiting some behavioral issues,

- 3 -

including three instances of stealing. Dean acknowledged that J.P. was "picked on," but elaborated that the children "pick on each other" and "[i]t's a back and forth kind of thing." Dean stated that Day was willing to adopt J.P.

¶ 10　　　　Dean also described I.B. and J.P.'s relationship with respondent. According to Dean, there was an "attachment" between the children and respondent. Respondent generally received one supervised visit with the children per month, although respondent occasionally cancelled those visits. Dean testified the visits between respondent and the children were always "appropriate" and that both children appeared to love their mother and enjoyed spending time with her. Dean explained that when the children first see respondent during their visits, they "run to her, give her a hug, give her a kiss. They are always eager to see her during the next visit."

¶ 11　　　　Dean agreed that her agency intended to keep I.B. and J.P. together and that, when I.B. was removed from Day's home, two other placement options suggested by respondent where both children could be together had been considered. Dean testified it was ultimately decided not to remove J.P. from Day's home because she had been there for such a long period of time.

¶ 12　　　　Dean testified it was in I.B. and J.P.'s best interest that respondent's parental rights be terminated based on the "longevity of the case" and because Day adequately met I.B. and J.P.'s needs. Both children "had a stable placement for the last three years," and respondent could not provide a "stable placement" for them. Dean explained that Day treated I.B. and J.P. the same as her own children and, in her opinion, none of I.B. or J.P.'s bad behavior was caused by Day failing to provide them with adequate attention. Although Dean acknowledged terminating respondent's parental rights would cause the children trauma, she agreed that "the benefit outweighs the harm."

¶ 13　　　　The second best-interest hearing was scheduled for June 20, 2019. Before the

- 4 -

proceeding commenced, however, respondent's attorney informed the trial court that since the previous hearing, both I.B. and J.P. had been removed from Day's home and placed into foster care. By agreement of the parties, the matter was continued.

¶ 14       When the best interest hearing resumed on October 2, 2019, the State recalled Dean. Dean first testified that she stopped serving as I.B. and J.P.'s caseworker on July 17, 2019. Before she changed roles, I.B. and J.P. were removed from Day's care and initially placed with a foster parent. I.B. was subsequently placed with his paternal grandmother, Ethel Pates, and J.P. was placed with fictive kin. According to Dean, the children were removed from Day due to a DCFS investigation into "whether or not there was neglect and lack of supervision in [Day's] home." Dean testified the allegations against Day were subsequently determined to be "unfounded" and J.P. was eventually returned to live with Day.

¶ 15       Dean testified I.B. enjoyed living with Pates and desired to continue living with her. Further, Pates was willing to provide permanency for I.B. and to allow I.B. to maintain a relationship with his father, respondent, and J.P. According to Dean, Pates had involved I.B. in many activities, including volunteer work. However, Dean also testified that I.B. had expressed that he missed J.P. Dean testified J.P. was misbehaving at school but that, while J.P. had lived in the home of fictive kin, she had expressed a desire to return to live with Day. According to Dean, Pates had informed her that she would find it "hard to accommodate" having J.P. in her home.

¶ 16       When asked whether, on the date she stopped serving as I.B. and J.P.'s caseworker, Dean still believed it was in the best interests of I.B. and J.P. that respondent's parental rights be terminated, she responded that she was "unsure" because the children had not been in their then-current placement for very long and the siblings were no longer living together. Dean summarized

the situation this way: "[I.B.] did not want to return to [Day's], [J.P.] did, but [I.B.] said he did want to stay with [Pates], but he really missed [J.P.]." Although Dean had considered moving I.B. and J.P. to the home of one of respondent's cousins, she decided against it because "[I.B.] wanted to stay with [Pates] *** and [J.P.] had moved another time, and we did not want to move her again."

¶ 17 The third best interest hearing was held on October 10, 2019. During that hearing, the State called Cybil Hoffman, I.B. and J.P.'s caseworker at the Center for Youth and Family Solutions since July of 2019 and a case aide assigned to I.B. and J.P. before that. Hoffman testified that Pates was willing to adopt I.B. and was meeting all of I.B.'s needs. I.B. had told Hoffman that he enjoys living with Pates and likes the school he attends. Hoffman also testified that J.P. was "making progress" in her placement with Day and all of her medical, educational, and social needs were being met. According to Hoffman, although J.P. and Day's other children "have their fights like all kids do," J.P. was happy living with Day and there was an attachment between J.P., Day, and the other children in Day's home. Both Day and Pates had expressed to Hoffman that if they were to adopt the minors, they would be willing to provide visits between I.B. and J.P.

¶ 18 Hoffman testified there was an attachment between respondent and the children. Respondent had recently moved into a new home which Hoffman deemed appropriate for the children. Hoffman testified that there had been two instances more than a year prior to the hearing where respondent had shown up for a visit with I.B. and J.P. while intoxicated, but there had been no other visitation problems since the children were removed from respondent. When asked whether Hoffman believed it was in the best interest of the children if respondent's parental rights were terminated, she responded, "I don't know how to answer that." Hoffman testified, "no

services are being really completed right now. [Respondent] still does visitations and she's still good with visitations but we also have to look at that it's been open for so long." Hoffman explained that, pursuant to respondent's service plan, she was still required to participate in mental health counseling and to see a psychiatrist, but she had not had an appointment with either her counselor or her psychiatrist since April 2019. However, Hoffman also testified "there's no ongoing active problems that [she] observed with *** [respondent]."

¶ 19　　　　The State next called Day. Day testified that she had been involved in the lives of I.B. and J.P. since before they were removed from respondent and that, before the removal, respondent would call Day whenever she needed parenting advice. Day also testified that when I.B. was removed from her home in July 2018, it was because "he was becoming more and more aggressive." According to Day, I.B. had informed her he "felt like everybody was against him or it was about [Day's] kids and then him and [J.P.]." Regarding J.P., Day testified that she was willing to adopt J.P. and to provide for her medical and educational needs. However, Day acknowledged J.P. had "behavioral issues, emotional issues, and sexual issues." Day opined the behavioral issues resulted from J.P. seeking attention and "still want[ing] to be a baby." Day testified that J.P. had emotional issues in that she "has periods of time where *** she'll be crying and she'll say *** she misses her brother." Finally, Day testified J.P. had exhibited "sexual behaviors," including masturbation, even when she was two years old and before she had been removed from respondent. Regarding each of these issues, Day testified she was aware of them and was working to resolve them, including by seeking counseling for J.P. As a further example, Day testified about a recent meeting she had attended with J.P.'s teachers where a plan to correct J.P.'s behaviors and improve her academic achievement had been discussed and implemented.

Day also testified she was willing to allow relationships between J.P. and her brother, father, and respondent.

¶ 20    Officer Dale Davis of the Springfield Police Department testified next. According to Officer Davis, on October 16, 2019, he responded to a reported vehicle crash. When he arrived at the scene, he found respondent "slumped in the vehicle." Respondent's vehicle was "off to the side of the roadway partially in a ditch." Officer Davis described respondent as being "very out of it, incoherent, struggled to answer my questions." Respondent refused to cooperate with a field sobriety test or blow into a breathalyzer. When Officer Davis searched the vehicle, he found a bottle of alcohol and a gas station beverage that he believed had been mixed with alcohol. Officer Davis arrested respondent for driving under the influence of alcohol.

¶ 21    Respondent testified on her own behalf. According to respondent, I.B. and J.P. had always had a close relationship with each other and, after I.B. had been placed with Pates, he told respondent "he d[id]n't want to go back to [Day's] house, but he hates that he's not at [Day's] house because now there's no one there to protect [J.P.]." I.B. had told respondent he did not want to return to Day's home because "he was always singled out and bullied or treated differently." Respondent further testified I.B. had informed her he was "happy and content" living with Pates. Respondent denied that, when I.B. and J.P. lived with her, they had exhibited any of the negative behaviors about which Day had testified. Respondent further denied J.P. had ever masturbated when she lived with respondent. She expressed concern about J.P.'s academic achievement, testifying that, in her opinion, J.P. did not "get[ ] enough of one-on-one time in the home, and her behavior in school clearly states that she can't focus or interact with the teacher in an appropriate manner where she can focus on her school work."

¶ 22　　　　Respondent admitted that she "abuse[s] alcohol sometimes," but she also stated that she had never consumed alcohol in front of I.B. and J.P. and that the only reason she abused alcohol was because she "want[ed] [her] kids back so badly." Respondent testified she intended to plead not guilty to the pending driving under the influence charge and she had never consumed alcohol and driven a car with children in it. Respondent further testified that if the children were returned to her, "[a]lcohol would be nonexistent in [her] life."

¶ 23　　　　Respondent testified she was able to provide I.B. and J.P. with stability, stating that when the children lived with her before they were removed, they "never went without anything that they ever needed." Further, if the children were returned to respondent, she would encourage their scholastic and extra-curricular activities and ensure their needs were met. According to respondent, if her parental rights were terminated, it would "hurt [the] children more and devastate them." Respondent understood that if her parental rights were not terminated the children would not be returned to her immediately and agreed to engage in any necessary services. Respondent testified she believed she had completed all of the services required by DCFS.

¶ 24　　　　On cross-examination, respondent admitted she was not employed and did not have a current driver's license.

¶ 25　　　　Julian Pierce, the father of J.P., testified next. He testified that he had observed respondent, I.B., and J.P. together before he was incarcerated in 2015. Pierce described respondent as an "[o]utstanding mother" and explained that she "s[a]t down and interact[ed] with the kids" and "wasn't harmful to them in no [*sic*] shape, form, or fashion."

¶ 26　　　　Next, Caroletta White, one of respondent's cousins, testified. According to White, although it had been several years since she had observed respondent interact with I.B. and J.P.,

when she had observed them together, it was evident respondent "[was a] great mother; children loved her. She thrived off them; they thrived off of her." White described the relationship between I.B. and J.P. as follows: "[I.B.] looked after [J.P.], always wanted to hold her hand" and "[J.P.] knew that [I.B.] was her brother and [was] very close and depended on him a lot." White also testified that when respondent still had I.B. and J.P., White would bring her own children over for respondent to babysit and White never had any concerns leaving her children in respondent's care. White concluded that it was in the best interest of I.B. and J.P. that they be returned to respondent.

¶ 27    Felicia Winder, another of respondent's cousins, testified next. Winder described respondent as an "awesome mother" and explained she "take[s] very good care of [I.B. and J.P.]." Winder also explained that the life respondent provided for I.B. and J.P. before they were removed was "absolutely what anyone would want for their children." Although Winder had observed J.P. with Day and confirmed J.P. was doing fine, she also testified the children would be "much stabler [*sic*] with their mother." Winder testified that, although she had not seen the children more than a few times since they were removed from respondent, it was in their best interest for the children to be returned to respondent.

¶ 28    Next, Victoria Kerr, the guardian *ad litem* assigned to I.B. and J.P., testified. Kerr testified that, during a conversation she had with I.B., he expressed a desire that he and his sister be returned to live with his mother. According to Kerr, I.B. stated respondent "understands him better than anyone" and stated he was J.P.'s "protector." Kerr also testified I.B. was "fine" living with Pates. Kerr concluded, "I do think it would be in their best interest not to have [respondent's] parental rights terminated at this stage."

¶ 29    Reggie Balthazar, the father of I.B., testified next. According to Balthazar, I.B. was

doing well living with Pates. He also testified that he considered respondent to be a good mother, but he admitted he had not been able to observe respondent and I.B. together for almost 10 years. Balthazar further testified he believed respondent would be a good mother if her parental rights were not terminated.

¶ 30 At the final best interest hearing, which was held on November 21, 2019, Pates testified. She testified that since coming to live with her, I.B.'s behavior was "a whole lot better." Pates also testified I.B.'s grades had improved and he participated in local programs and events with Pates. However, Pates testified I.B. had expressed to her that he "wants a family togetherness *** with his mom and his sister." Although Pates had not observed respondent interact with I.B. and J.P. since the children were removed from her, Pates testified that when she had observed respondent's parenting abilities in the past, "she always was a good parent." Pates was willing to adopt I.B. and testified, if that happened, she would attempt to foster a relationship between I.B. and J.P.

¶ 31 At the end of the best interest hearing, the trial court noted, "I've obviously gone through the best interest factors, I [have] gone through them, as everybody else has gone through them, so I'm well aware of what the best interest factors are." The court found it was unlikely that respondent would "address what she needs to address after four years" such that I.B. and J.P. could be returned to her and noted respondent had never received an unsupervised visit and had ongoing issues with alcohol. The court further found it was unlikely the children could be placed in the same foster home. The court summarized the evidence as follows:

"I've not heard anything that [J.P.] is not doing well in the home of [Day].
[I.B.] is doing very well in the home of [Pates]. Both of those people have stated

that they are willing to provide permanence for these children.

* * *

*** They are both now in stable homes. *** [I.B.] has a stable home with two grandparents who love him very much. He is doing well in school. He is doing well in their home. He is engaged in community activities. He gets to have contact with his father. He will continue to have contact with his father. [Pates] says she will allow contact with [respondent]. He has got the best of all worlds right now.

[J.P.] is in a home where *** she has been for most of her life. From the evidence I've heard, she is doing well there.

* * *

Right now, considering all of the issues, right now, the children are safe and being cared for. They do have an identity, and they are with relatives right now.

They have an attachment to the parents. There's a possibility that they could maintain that relationship even if rights are terminated, particularly for [I.B.]

They are secure at this point. They are in homes that they are familiar with. There is affection for the children right now. The least disruptive right now is to leave them where they are."

The court concluded:

"I do find it beyond a preponderance of the evidence, based upon the length of time that this case has gone on and the issues that are still present today, the length of time that would be needed to determine whether or not [respondent], after four years, is going to address those ***. These children deserve more than that."

- 12 -

¶ 32 This appeal followed.

¶ 33                                  II. ANALYSIS

¶ 34 On appeal, respondent argues the trial court's finding that termination of her parental rights was in I.B. and J.P.'s best interest was against the manifest weight of the evidence.

¶ 35 Pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2018)), a trial court may terminate parental rights where it finds that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and that termination is in the minor's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69, 74-75. Following a finding of parental unfitness, the trial court proceeds with the best-interest stage of termination proceedings where it "must give full and serious consideration to the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290 (2009). During this second stage of proceedings, the State has the burden of proving that termination is in the minor's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004). The Juvenile Court Act sets forth various factors for a trial court to consider when making a best-interest determination. See 705 ILCS 405/1-3(4.05) (West 2018). Those factors, which must be considered in the context of the child's age and developmental needs, include (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 36 "[A] reviewing court will not reverse a trial court's best-interest determination

unless it is against the manifest weight of the evidence." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate [the court] should have reached the opposite result." *Id.* The trial court's determination of a child's best interest is given great deference because that court "is in the best position to observe the demeanor of the witnesses and the parties, assess credibility, and weigh evidence." *Jay H.*, 395 Ill. App. 3d at 1070.

¶ 37    Here, we find that the trial court's determination that it was in the best interest of I.B. and J.P. to terminate respondent's parental rights was not against the manifest weight of the evidence. Although no witness unreservedly stated termination of respondent's parental rights was in the best interest of I.B. and J.P., and several witnesses testified it was in the children's best interest that respondent's rights not be terminated, the court was not obligated to accept that testimony. Rather, the court was required to weigh all of the evidence presented against the statutory factors. Viewed in its entirety, the evidence established that both I.B. and J.P. were in stable, secure, and loving homes. Although I.B. had only lived with Pates for a few months, he was obviously thriving—his behavior and his grades were both improving and he was active in the community. J.P. had lived with Day most of her life. Although several witnesses expressed concerns about J.P.'s behavioral and sexual issues, Day testified she was working to address those concerns and Hoffman testified J.P. was "making progress" in Day's home. Both children had a strong relationship with their respective foster parents and the children's medical, educational, and social needs were being satisfied. Pates was willing to adopt I.B. and Day was willing to adopt J.P.

¶ 38    We note that a relationship obviously existed between the children and respondent. I.B. had told Kerr that respondent "understands him better than anyone." Dean testified that both

children were always excited to see respondent during their visits. However, "the existence of a mother-child bond does not automatically insure [*sic*] that the parent will be fit or that the child's best interests will be served by that parent." (Internal quotation marks omitted.) *In re K.H.*, 346 Ill. App. 3d 443, 463, 804 N.E.2d 1108, 1124 (2004). Although multiple witnesses testified respondent was a good mother, none of them had observed her interact with I.B. and J.P. since DCFS removed the children nearly four years prior to the date they testified. Moreover, the evidence showed that, although respondent had attended substance abuse classes, she continued to abuse alcohol and had even been arrested for driving under the influence during the pendency of the best interest proceedings. Although respondent had obtained housing that was appropriate for the children, in four years she had not completed all the goals established by DCFS to correct the conditions which led to the removal of the children. Specifically, Hoffman testified respondent still required mental health counseling and psychiatric care, yet, when Hoffman testified in October 2019, respondent had not had an appointment with either of her mental health professionals in six months.

¶ 39 It is also apparent that I.B. and J.P. would like to live together. Day testified J.P.'s emotional issues had worsened since I.B. was removed and that J.P. would often cry that she missed him. Kerr testified I.B. wanted to live with J.P. because he was her "protector." However, the children's desire to live together must yield to their individual needs. I.B. preferred living with Pates and Pates was meeting all of his needs. Although Pates was willing to adopt I.B., she was unwilling to adopt J.P. and I.B. did not wish to return to live with Day. Other living arrangements where both I.B. and J.P. could live together had been considered but were rejected for various reasons. Moreover, both Pates and Day had expressed that they would endeavor to provide visits

- 15 -

between I.B. and J.P. As previously stated, both children were doing well in their respective foster homes even though they were not together.

¶ 40    Based on the foregoing, the trial court's determination that it was in I.B. and J.P.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 41                          III. CONCLUSION

¶ 42    For the reasons stated, we affirm the trial court's judgment.

¶ 43    Affirmed.