2020 IL App (2d) 191102-U
No. 2-19-1102
Order filed May 26, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23(c)(2) and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* P.H., a minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No. 16-JA-101 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Linda S. Abrahamson, |
| Appellee v. K.M., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the State proved by a preponderance of the evidence that termination of parental rights was in the minor's best interest is not against the manifest weight of the evidence.  Affirmed.

¶ 2    Following a bifurcated proceeding, the trial court found respondent, K.M., unfit to parent her child, P.H., and that it was in P.H.'s best interest to terminate respondent's parental rights.  On appeal, respondent does not challenge the unfitness finding made by the trial court.  Rather, she only contests the finding made by the trial court that it was in the best interest to terminate her parental rights in P.H.  For the reasons below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    We have thoroughly read the record and the parties are familiar with the facts. Accordingly, we will recite only those facts which we find relevant to the disposition of this appeal.

¶ 5    Respondent is the biological mother of P.H., born April 26, 2015. The biological father of P.H., who signed a consent for P.H.'s adoption, is not a party to this appeal.

¶ 6    P.H. was born prematurely requiring extended hospitalization after her birth. She was diagnosed with global developmental delay, failure to thrive, congenital hypothyroidism, oropharyngeal dysphagia (G-tube dependent), mild cerebral palsy, and reactive airway disease. P.H.'s medical conditions require continued care, therapy, and attention from numerous medical specialists. Because P.H. is a medically complex child, she needs daily care. P.H. and her younger sibling both received nursing care in respondent's home, Monday through Friday.

¶ 7    The State became involved with this particular case in December 2016, when respondent cancelled the nursing staff and, without making anyone aware of where she and her five children were going, moved them from Chicago to a hotel in Kane County, where P.H.'s younger sibling died. P.H. was approximately sixteen months old at the time. The State filed a petition for an adjudication of neglect on December 13, 2016, claiming, *inter alia*, that P.H. was placed in an injurious environment because respondent failed to follow through with the recommendations of medical professionals regarding P.H's needs, specifically placing P.H. at risk of harm by not allowing nursing staff access to P.H. Respondent did not enter into any stipulations regarding P.H.'s younger sibling's death.

¶ 8    On June 27, 2017, at the adjudication hearing, respondent stipulated to the factual basis that she was not fit to parent. Thereafter, following a dispositional hearing, the court found P.H. was neglected, and made her a ward of the court, placing her in the guardianship and custody of the Department of Children and Family Services (DCFS).

¶ 9    In November 2017, respondent was hospitalized after being seriously injured by P.H.'s father in a domestic violence incident. The first permanency review took place a month later, by which time P.H. had been in foster care for nearly one year. This also was the point when respondent had moved to Florida to distance herself from the father and to be with her family. The trial court allowed respondent to take her other children with her to Florida over the objection of the State but kept P.H. here in foster care out of concern for respondent's ability to care for her. Over time after moving to Florida, respondent stopped making reasonable efforts to achieve unification with P.H.

¶ 10    On July 30, 2019, the State filed an amended petition seeking to terminate respondent's parental rights for (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to P.H.'s welfare; (2) failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from respondent; (3 and 4) failure to make reasonable progress toward the return of the child within the nine-month period after adjudication of neglected minor, namely, June 28, 2017, through March 28, 2018, and March 29, 2018, through December 29, 2018; (5) deserting the child for more than three months next preceding the commencement of the adoption proceeding; and (6) evidencing an intent to forego her parental rights, as manifested by her failure for a period of 12 months to maintain contact with or plan for the future of the child, though physically able to do so.

¶ 11    Following the hearing, the court found the State had proved by clear and convincing evidence that respondent was unfit pursuant to the first four allegations of unfitness. See 750 ILCS 50/1 (D)(b), (m)(i), m (ii) (West 2018). The primary concern underlying the court's finding was respondent's failure to gain the knowledge, familiarity, and training regarding P.H.'s medically complex needs "to effect a safe return home."

¶ 12    The court subsequently proceeded to the best-interest phase of the bifurcated proceeding. The court admitted into evidence two court appointed special advocate (CASA) reports of July 3, 2019, and August 28, 2019, and Youth Services Board (YSB) reports from the same time frame. At respondent's request, and due to the absence of respondent and Beverly Hoskins, P.H.'s great grandmother, from the hearing, the court took judicial notice of their testimony from the unfitness hearing. The court also admitted several exhibits submitted by respondent, stating that it would give them the appropriate weight.

¶ 13    P.H.'s foster mother, Cassy B. testified that P.H. had been living with her and her paramour, the foster father, Casey K., full time since August 2019. Prior to that she had known P.H. for over a year during which time she would provide respite care and care over the weekends, and thus P.H.'s transition to living with them full time had been an easy adjustment. P.H lives with four other foster children: two sibling Hispanic boys, ages 7 and 12, and two sibling African Americans, a 4-year-old boy and a 3-year-old girl. All the children get along very well. It has helped P.H. because she sees what the other children are doing and P.H. strives to keep up with them. P.H. loves her foster parents and calls them "mom" and "daddy."

¶ 14    They live in a large four-bedroom house. P.H. shares a bedroom with her foster sister. P.H.'s bed is fitted with a safety railing to prevent her from falling. Cassey B. also installed safety gates on the stairs, although P.H. can go up and down the stairs holding the handrail with someone behind her. P.H. rides a bicycle but maneuvers it with her feet. The family encourages P.H. to do as much as possible by herself.

¶ 15    Cassy B. was a full-time registered nurse but decreased her hours to two to three days per week so that she could care for P.H. Her nursing background gives her the special knowledge and training to assist with P.H.'s developmental issues. Casey K. is a CNA and currently does in-home

healthcare for three young gentlemen outside of the foster home, two of whom have autism and one cerebral palsy.

¶ 16    Cassy B. is very close with her extended family, who live about 10 minutes away from her. They spend every Sunday and holidays together. P.H. is treated as part of the extended family. The foster family is active in their church.

¶ 17    Cassy B. further testified as to P.H.'s ongoing physical, occupational, and speech therapy, which she is able to supplement at home. For instance, Cassy B. provides puzzles and scissors to work on P.H.'s occupational skills and she encourages P.H. to use her walker. Cassy B. is familiar with P.H.'s diagnoses, the attending doctors, and the current medical equipment P.H. needs to assist her with mobility and vision. P.H. does not need as much medication as she previously did, but she still uses the nebulizer daily. P.H. has grown "tremendously" in the year and a half since Cassy B. has known and cared for her.

¶ 18    P.H. is African American and Cassy B. plans on teaching P.H. about her cultural identity through books, friends, and role models. Cassy B. stated that it is very important that P.H. remains in communication with her biological family. She noted that in the last six months, there had been four to five video chats between P.H. and respondent. The foster parents wish to adopt P.H.

¶ 19    Before testifying, the court took judicial notice of the entire testimony of Rebecca Krise, P.H.'s current YSB caseworker, from the unfitness portion of the termination proceeding.

¶ 20    Krise then testified that it was apparent that P.H. was loved by the foster family. She found that there is a definite attachment, and the foster parents love her like one of their own. Krise had no safety concerns about P.H. and believed that the foster home was safe and appropriate for P.H.'s special needs. Krise observed that P.H. is happy, healthy, and feels safe with the foster family. She believed that P.H.'s speech has greatly improved. Krise also observed that keeping up to date

on P.H.'s medical care was "pretty crucial" and that her care giver must know P.H.'s requirements, such as therapies, medications, and treatment techniques. Krise believed that the foster family met those needs and that both foster parents have the medical background important for P.H.'s health, safety, and development. In her opinion, it was in P.H.'s best interest that the foster family adopt her.

¶ 21   Krise testified on cross-examination that respondent had not been there for P.H. In response to whether termination was necessary if respondent could be trained in the same way the foster parents have been, Krise stated that P.H. needs a parent who is willing to meet P.H.'s needs "day-after-day," and respondent has not been able to demonstrate this level of care. Krise opined that she felt it was necessary to terminate respondent's parental rights based on respondent's lack of progress over the past year or two, *i.e.*, not being involved in P.H.'s medical care, not attending visits with her or video chats, not participating in therapies, and not being up-to-date on her medical care, which was crucial.

¶ 22   In the CASA report of August 28, 2019, the CASA had no concerns with the foster family meeting P.H.'s medical needs. She noted that P.H. was more verbal and her speech articulate and assumed that this was due to daily interaction with the other foster children. The CASA reported that P.H. engages with and plays happily with her foster siblings. She reported that both foster parents are openly affectionate with all the children and P.H turns to them for her needs and attention. She believed that all of P.H.'s needs—educational, medical, emotional, and social—are being met.

¶ 23   Following argument, the court methodically considered the applicable best-interest factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2016)). The court observed that the "parent/child relationship was significantly altered and

impaired when [respondent] went to Florida." Although respondent had moved to Florida for her own safety, the court found that it had a big impact on her ability to stay involved in P.H.'s life and she had not provided for or met P.H.'s needs for about three years. The court noted that, at the time of the ruling, P.H. had been in care for three years and was 4 1/2 years' old. The court found that P.H. was "entitled to permanence sooner than later" and the foster parents are committed to providing permanency for this child. And so, after assessing all the relevant factors and giving them their appropriate weight, the trial court found that the State proved by a preponderance of the evidence that it was in P.H.'s best interest that respondent's parental rights be terminated.

¶ 24    Respondent timely appeals, challenging only the trial court's best-interest finding terminating her parental rights in P.H.

¶ 25                                    II. ANALYSIS

¶ 26    Initially we note that respondent does not challenge the trial court's finding that she was unfit by clear and convincing evidence, but instead appeals only the court's finding that it was in P.H.'s best interest to terminate respondent's parental rights. After a parent is found unfit, the trial court shifts its focus in termination proceedings to the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best-interest stage, a "parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* See *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008) (the purpose of the best-interest hearing is to minimize further damage to the child by shifting the court's scrutiny to the child's best interest). Before a parent's rights may be terminated, the trial court must find that the State proved, by a preponderance of the evidence, that it is in the child's best interest those rights be terminated. *In re D.T.* 212 Ill. 2d at 366.

¶ 27    We will not overturn the trial court's finding that termination of parental rights is in the

child's best interests unless it is against the manifest weight of the evidence. *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 24. Such a determination is against the manifest weight of the evidence only if the opposite conclusion is clear or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 28    When considering whether termination of parental rights is in a child's best interest, the trial court must consider various statutory factors within "the context of the child's age and developmental needs." These include the following: "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including: (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued); (ii) the child's sense of security; (iii) the child's sense of familiarity; (iv) continuity of affection for the child; (v) the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3 (4.05) (a) to (j) (West 2016).

¶ 29    In ruling, the court discussed the evidence presented at the hearing as it related to each of the best interest factors it found relevant and concluded factors (a), (d), (e), (f), (g), (i), and (j) weighed in favor of termination. Factors (b) and (c) favored against termination, and factor (h) was neutral. Specifically, the judge noted:

"The best interests evaluation is not and should not be a rehash of fitness and I know that some of those facts kind of can be relevant and kind of bleed into what we are doing here now, but I note that in ten days this child will have been in care for three years. She is four-and-a-half years old, so she was just like about a year-and-a-half when she came into care. And so[,] applying the evidence that I heard here today to the best interests factors, which are found at 405/1-3(4.05) which are mandated that I consider.

Number A, physical safety and welfare of [P.H.], including food, shelter, health, and clothing. Those needs have not been met by her mom for three years and not even remotely by her mom since -- for about two years, since December of 2017 when she went to Florida. And I do not disagree with [respondent's counsel] reminding that she did that for her open safety. Absolutely. But it—it had a big impact on her ability to stay involved in this child's life. So[,] [respondent] has not been—has not provided those needs or has not met [P.H.'s] needs in that regard.

The development of [P.H.'s] identity. It is not disputed that the foster parents here today are Caucasian or white and [P.H.] is African/American, so is her mom, so is her dad, so is Ms. Hoskins, and her entire family, but the testimony was from Foster Parents they have a commitment to acknowledge [P.H.] culture and a willingness to even include members of her personal and birth family so long as that can be safe. I do note that they are now caring for two other African/American kids in their home. I am not going to give that particular factor a lot of weight because they are not necessarily going to be there forever, and I don't know their status, and so I can't—I can't put a lot of weight on that, but they are there now.

Number C, her background ties, including familial, cultural, and religious, kind of merges into B, and so I don't have anything in addition to say on C.

And so[,] I think that those factors may—Number A favors termination. B and C may favor not termination. Number D the child's sense of attachments, including where she feels love, her sense of security, familiarity, and affection and the least disruptive placement. I think that under D all of those strongly favor termination of parental rights.

Again, [respondent] has not parented this child for three years and has been a half a country away for her for two. One of the notes that I made at one point in our proceedings is skyping even now is not and cannot be a substitute for parent/child time. It is—it's not even close.

Anyway, I think that that parent/child relationship was significantly altered and impaired when [respondent] went to Florida.

The child's wishes and long-term goals. [P.H.] is far too young to have those and so I put the Guardian *Ad Litem's* argument kind of in that category, so that one would favor termination.

Her community ties, including church, school, and friends. To the extent that she has those as now a four-and-a-half-year-old, she wouldn't have had many or any of those as a year-and-a-half- old, so that factor favors termination.

Her need for permanence, including her need for stability, continuity of relationships, etcetera. I believe that that factor favors termination. When there are observations that when [P.H.] is flustered or need[s] that she goes to the—Cassie and Casey who are in this room, her current foster parents, for comfort, nurturance, and her needs are

being met by them that a—that a lay person could make an observation of attachment when a child goes to an adult for those kinds of things.

Further, that the argument in—by mom that there would have needed to be evidence that [respondent] could not or would not provide permanency to [P.H.] at this time is not well taken. There has been a finding that she is not fit to parent. So[,] at this moment she is not a permanency option because she has been found by clear and convincing evidence to be not fit. So that argument is not well taken. And we should not at this point have to wait for a child to disregulate. She is entitled to permanence sooner than later and so, again, Number G favors termination.

Uniqueness of every family and child. I frankly don't know what that means[,] and I have never known what that means, so I am going to call that neutral. But the risks attendant to entering and being in substitute care, again goes—so we didn't need to have to wait for her to disregulate, because if she stays in care to the point of disregulation, getting her regulated again may be beyond anybody's ability. And so that factor also favors termination.

And Number J, the preferences of the people available to care for her. The Foster Parents who are here today have committed to providing permanency to this child, so that factor would also favor termination. So assessing all of the relevant factors and giving them there appropriate weight, I believe that the State has shown by a preponderance of the evidence that it is in [P.H.] best interests at this time to terminate [respondent's] parental rights."

¶ 30    In arguing that the trial court abused its discretion in terminating her parental rights, respondent maintains that the court gave too much weight to testimony regarding her conduct

during the unfitness portion of the hearing. We note, however, that at the best-interest hearing the "full range of the parent's conduct" must be considered, including the grounds for finding the parent unfit. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). Such evidence is a "crucial consideration" at the best-interest hearing. *In re D.L.*, 326 Ill. App. 3d 262, 271 (2001).

¶ 31 Respondent argues factor (a) ( the physical safety and welfare of the child, including food, shelter, health, and clothing describe factor) favors her because she provided proof about the various services which she had completed in Florida, *i.e.*, that she has met the minimum parenting standards, completed individual therapy, continues to visit P.H. as allowed, maintained employment, and there is no proof that respondent would not provide for the welfare and safety of the children or is unable or lacks the resources to provide food, shelter health, and clothing for P.H. Respondent further maintains that factors (f) ( the child's community ties, including church, school, and friends) and (g) (the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; describe) also favor her because the need for stability and permanency lies through P.H.'s reunification with respondent. As the trial court observed, these arguments are not well taken because respondent was found by clear and convincing evidence to be unfit and respondent is not a viable placement for permanency.

¶ 32 Respondent also argues that, even though the court correctly found factors (b) and (c) weighed against termination, it abused its discretion by not weighing these factors as a "contrasting determination of strong support" for respondent's parental rights. Respondent further asserts that factors (d) and (e) favor her because the exhibits and the testimony support her love and attachment for P.H. Respondent contends that factor (j) favors her, asserting that P.H.'s special needs and disability have changed and gradually improved over time and that there has been less need for

- 12 -

medical care. Given P.H.'s gradual improvement and the relatively brief time of placement with the foster family, respondent argues the special needs of P.H do not weigh in favor of termination but weigh in favor of respondent's parental rights.

¶ 33     All the above arguments essentially ask this court to reweigh the evidence presented below to reach a different conclusion. However, "[i]t is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Rather, we reverse a best interest finding only if the opposite conclusion is clear or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.* at 498.

¶ 34     Here, the trial court's determination is amply supported by the record. Krise testified that it would be in P.H.'s best interest to be adopted by the foster parents. The foster parents had been involved in taking care of P.H. on a part or full-time basis for a year and a half, including providing a safe, stable, nurturing home environment, and have the training to properly attend to her significant continuing medical needs. Further, they indicated their desire to adopt P.H., who refers to her foster parents as "mom" and "daddy." Similarly, she views her foster siblings as her brothers and sister. P.H.'s development and progress in her current foster placement has been significant.

¶ 35     As it relates to respondent, P.H. had little opportunity to develop a bond with her due to respondent's failure to make reasonable efforts or progress toward the goal of return home. Even if there existed a bond between respondent and P.H., this would not automatically ensure that a parent will be fit or that the child's best interest will be served by that parent. See *In re K.H.*, 346 Ill. App. 3d 443, 463 (2004). An adoptive home is available not only to satisfy P.H.'s vital medical needs but also her need for permanency and stability. The trial court's observation that further

delay and lack of permanency and stability certainly would not be in P.H.'s best interest was reasonable. See *In re K.H.*, 346 Ill. App. 3d at 463 (permanency and stability are important for a child's welfare).

¶ 36     Given the applicable standard of review, we conclude that the court's finding that it is in the best interest of P.H. to terminate respondent's parental rights is not against the manifest weight of the evidence.

¶ 37                                III. CONCLUSION

¶ 38     Based on the preceding, we affirm the judgment of the Circuit Court of Kane County terminating respondents' parental rights.

¶ 39     Affirmed.